## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

FIRST BANK OF DELAWARE, a
Delaware Corporation,
1000 Rocky Run Parkway
Wilmington, Delaware 19803,

                    Plaintiff,

               v.

LEANSPA, LLC, a Connecticut limited
liability company,
420 East Main St., Building 2 Suite 8
Branford, Connecticut 06405;

BORIS MIZHEN, an individual,
53 Prospect Road
Guilford, Connecticut 06437;

CHECK21.COM, LLC, a Florida Limited
Liability Company,
3389 Sheridan Street, Suite 503
Hollywood, Florida 33021;

IDO MEROS,
an individual,
4009 N. 49th Avenue
Hollywood, Florida 33021;

                  Defendants

CIVIL ACTION NO.

## COMPLAINT

Plaintiff First Bank of Delaware alleges as follows:

## NATURE OF THE ACTION

1.  Plaintiff First Bank of Delaware brings this action to recover damages and other relief

available at law or in equity against defendants LeanSpa, LLC and Boris Mizhen for their

conduct relative to certain merchant account services performed by First Bank of Delaware,

resulting in millions of dollars in damages to First Bank of Delaware.  In addition, defendants Check21.com, LLC and Ido Meros, who referred LeanSpa, LLC to First Bank of Delaware, were required to, among other things, monitor LeanSpa, LLC to ensure it was an honest merchant and, having failed to do so, are liable for breach of their agreement with First Bank of Delaware and for indemnity.

2.  Specifically, LeanSpa, LLC and Boris Mizhen intentionally concealed the nature of their business (falsely promoting products for unsubstantiated claims of weight loss), historical chargeback problems, and their lack of practices and procedures to minimize chargebacks, all in an effort to obtain and maintain a merchant account with First Bank of Delaware.

3.  Check21.com, LLC and Ido Meros woefully failed to perform under their agreement with First Bank of Delaware, which required them to monitor LeanSpa, LLC and its activities to ensure LeanSpa, LLC and Boris Mizhen were not engaging in fraudulent conduct or other high-risk practices.

4.  By the time First Bank of Delaware learned LeanSpa, LLC and Boris Mizhen were engaged in a large consumer fraud, First Bank of Delaware had already been subjected to more than $1.8 million in chargeback handling fees in a seven-month period.  That amount that is expected to grow over time.

## PARTIES

5.  Plaintiff First Bank of Delaware ("Plaintiff" or "FBD") is a commercial bank chartered under the laws of the State of Delaware with its principal place of business at 1000 Rocky Run Parkway, Wilmington, Delaware 19803.

6.  Defendant LeanSpa, LLC ("LeanSpa") is a limited liability company organized under the laws of the State of Connecticut with its principal place of business at 420 East Main St., Building 2, Suite 8, Branford, Connecticut 06405.

2

7.  Defendant Boris Mizhen ("Mizhen") is a resident and citizen of Connecticut with a residence address of 53 Prospect Road, Guilford, Connecticut 06437.

8.  At all relevant times, Mizhen was the principal, owner, officer and managing member of LeanSpa.  Mizhen is doing business as LeanSpa and LeanSpa is an alter ego of Mizhen in that there is such a unity of interest between the LeanSpa and Mizhen that they are indistinguishable from one another.  Facts in support of this contention include LeanSpa is inadequately capitalized and staffed, does not regularly maintain corporate meetings and minutes, comingles funds, and does not respect corporate formalities.  In addition, LeanSpa has an unusually high charge back rate, which further evidences that LeanSpa is sham corporation used to run a fraud against the public.  As such, an inequitable result would occur if Mizhen and LeanSpa are not treated as one and the same.

9.  Defendant Check21.com, LLC ("Check21") is a limited liability company organized under the laws of the State of Florida with its principal place of business at 3389 Sheridan Street, Suite 503, Hollywood, Florida 33021.

10.  Defendant Ido Meros ("Meros") is a resident and citizen of Florida with a residence address of 4009 N. 49th Avenue, Hollywood, Florida 33021.

11.  At all relevant times, Meros was the principal, owner, officer and managing member of Check21.  Meros is doing business as Check21 and Check21 is an alter ego of Meros in that there is such a unity of interest between the Check21 and Meros that they are indistinguishable from one another.  Facts in support of this contention include Check21 is inadequately capitalized and staffed, does not regularly maintain corporate meetings and minutes, comingles funds, and does not respect corporate formalities.  As such, an inequitable result would occur if Meros and Check21 are not treated as one and the same.

3

## JURISDICTION AND VENUE

12.   Subject matter jurisdiction is proper in this case on the basis of diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1) in that Plaintiff is a citizen of the State of Delaware, and defendants LeanSpa and Mizhen are citizens of the State of Connecticut and defendants Check21 and Meros are citizens of the State of Florida, and the amount in controversy exceeds $75,000.00.

13.   This Court has personal jurisdiction over all defendants under the Delaware long-arm statute, Del. Code Ann. Tit. 10 § 3104(c)(1), because, among other things, each of the defendants has either transacted business or performed any character of work or service in Delaware giving rise to this dispute.  In addition, each of the contracts at issue in this action contains a provision whereby the parties have consented to exclusive jurisdiction and venue of any dispute being in the federal or state courts sitting in New Castle County, Delaware.  This Court's exercise of personal jurisdiction over each of the defendants is consistent with the requirements of the Due Process Clause of the United States Constitution.

14.   Venue is proper pursuant to 28 U.S.C. § 1391(a) because, in addition to the exclusive forum selection clause in the contracts between the parties, each of the defendants is subject to personal jurisdiction in this district, and a substantial part of the acts, conduct, events or omissions occurred within the State of Delaware.  There is no other venue in the United States that would be more appropriate for this action than the State of Delaware.

## FACTUAL BACKGROUND

### *First Bank of Delaware*

15.   FBD is a full-service, state-chartered bank serving the needs of individuals, businesses, and families throughout the state of Delaware.  As part of its business banking, FBD offers merchant banking services to qualifying businesses.

4

### *LeanSpa and Mizhen*

16.  LeanSpa and Leanspa.com are owned and operated by Boris Mizhen, LeanSpa's sole owner, managing member, and Chief Executive Officer.

17.  LeanSpa markets a proprietary dietary supplement product to support weight loss, which is a known problem product in the nutraceutical world.  LeanSpa markets through affiliates and processes through surrogates.

18.  LeanSpa advertises online that its products promote weight loss and are celebrity endorsed:

> Unlike dietary pills that we have all heard about in the past that claims to make a person skinny, this product works naturally within your body to help you look your best.  There are no harmful substances, and there were no dangerous side effects similar to what you might experience with an over-the-counter diet pill of some kind.  Many celebrities have reported using this particular product and even more have secretly been using it as their secret weapon for looking amazing before filming begins.

19.  LeanSpa offers its products through so-called 14-day trial periods, which result in continuity billing.  As it turns out, consumers are misled and/or not adequately informed of the continuity billing program which results in consumers having their credit charged on a monthly basis without any further notice or assent.

20.  Indeed, FBD is informed and believes that such fraudulent conduct is a pattern and practice by Mizhen.  LeanSpa is now shut down.

21.  Even a cursory internet search reveals that consumers across the nation have been misled and defrauded by Mizhen and the many different companies he operates.  One consumer has posted the following warning:  "Biggest scam on the market!  Customer Service is a JOKE! Don't try to return it and get your money back - that is a fight you won't win!  DO NOT BUY THIS PRODUCT!!"  Another consumer warned:  "Lean Spa is an example of diet pill company

that is more concerned with getting your credit card number than helping you lose weight. Unless you want to be one of the hundreds of angry past Lean Spa customers, we recommend staying clear of Lean Spa."  There are numerous similar complaints across the internet.

22.  Consumers are not the only victims of Mizhen and his fraudulent conduct.  Recently, Software giant Microsoft sued spammer Mizhen in federal court under the federal CAN-SPAM (Controlling the Assault of Non-Solicited Pornography And Marketing) Act in a lawsuit captioned *Microsoft Corp. v. Mizhen, et al.*, Civil Action No. 10-cv-0966-RSM (W.D. Wash.) (the "Microsoft Lawsuit").

23.  In the Microsoft Lawsuit, Mizhen was alleged to have sent unsolicited spam e-mails to the customers of Microsoft's Windows Live Hotmail and to have evaded its spam filters. Microsoft sued ***three other companies controlled by Mizhen***:  New Age Opt-In, Inc., Media Network, Inc. and I-Permission, Inc., alleging that all of these companies pose as online ad companies, but are in fact are used to send spam e-mails by their owner (Mizhen).

24.  On or about June 7, 2011, in settlement of the Microsoft Lawsuit, the parties stipulated to entry of a permanent injunction against each of the defendants, and for entry of a money judgment against the above three corporate defendants in the principal amount of $10,000,000.  (*See Microsoft v. Mizhen*, Docket Entries 24-27.)

25.  It is apparent that Mizhen creates corporations solely to facilitate his highly questionable  marketing schemes.  LeanSpa itself is inadequately capitalized and staffed, does not regularly maintain corporate meetings and minutes, comingles funds, and does not respect corporate formalities.  In addition, LeanSpa has an unusually high charge back rate, which further evidences that LeanSpa is sham corporation used to defraud the consumer public.  As

6

such, an inequitable result would occur if Mizhen and LeanSpa are not treated as one and the same.

### Check21 Refers LeanSpa to FBD

26.  Check21 engages in the business of an ISO, which markets the transaction card processing services of third parties (e.g., banks) to businesses and provides support services related to such processing.  An ISO usually provides the frontline customer service, chargeback processing and risk monitoring functions for the merchant transactions.  The ISO is the party in the chain with the most direct contact to the merchant.

27.  On March 2, 2010 Check21 and FBD entered into a Merchant ISO Agreement, which was amended effective as of March 3, 2011 (collectively, the "ISO Agreement").  The ISO Agreement  contains a very broad, perhaps overly broad, confidentiality provision,  Article 9, and therefore out of an abundance of caution, FBD is seeking to file it under seal or in redacted form. Attached as **Exhibit A** is a CM/ECF placeholder page pending action on the motion to file under seal.

28.  Under the ISO Agreement, Check21 is required to perform the following:

    A.  Conduct due diligence on each potential merchant who completes a merchant agreement with FBD to ensure that the merchant satisfies the requirements for merchant services with FBD.  (ISO Agreement at "Schedule D".)

    B.  Monitor the adequacy of the LeanSpa's reserve account with FBD and immediately notify FBD if the amount is inadequate.  (ISO Agreement ¶ 3.2.)

    C.  Monitor LeanSpa's account "in order to detect unusual or unacceptable trends"  in LeanSpa's sales activity and recommend to FBD to hold funds, suspend service, or cancel the Merchant Agreement.  (ISO Agreement ¶ 4.7.)

D.  Notify FBD as soon as it becomes aware of any information that negatively

reflects on LeanSpa.  (ISO Agreement ¶ 4.8.).

E.  Be responsible for "losses of Merchants [LeanSpa] or amounts owing to FBD or

any Association for any reason including merchant fraud, chargebacks,

bankruptcy, violations of Applicable Law, Information security practices or

otherwise."  (ISO Agreement ¶ 4.10.)

F.  Indemnify FBD.  "ISO will indemnify and hold FBD harmless from and against

***any and all*** claims, damages, fines, demands, judgments, injunctions or losses

suffered or incurred by FBD (including attorneys fees and costs) (the "Losses") in

connection with ***any*** (i) Merchant of ISO, including, without limitation, Losses

associated with purchases that are charged back to, and not paid by, a Merchant,

fines, fees, assessments, penalties, expenses or any other charge assessed by any

Association relating to any Merchant, and losses arising out of any breach of a

Merchant Agreement by a Merchant . . . ."  (ISO Agreement ¶ 7.1.)

In addition, Check21 must "indemnify and hold FBD and the Associations

harmless from and against any and all Losses arising out of or relating to any

breach by ISO of its representations, warranties or agreements under this

Agreement or arising out of any act or omission by ISO . . . ."  (ISO Agreement

¶ 7.3.)

G.  The ISO Agreement also dictates that Check21 will only refer or "park" honest

and reputable merchants with FBD and will actively monitor the merchants to

ensure that they are not high risk or red-flagged merchants.

29.   Meros, as a principal and sales agent for Check21, is personally responsible for complying with the ISO Agreement, including each of the above provisions, as well as FBD's Code of Ethics, FBD's Rules for ISOs, and Credit Card Payment Industry Association Rules. Meros acknowledged his personal responsibility by signing both the ISO Agreement and "Schedule F" of the ISO Agreement.  (ISO Agreement ¶ 1.7, p. 22, and "Schedule F".)

### *LeanSpa Applies For Merchant Banking Services With FBD But Conceals Critical Information*

30.   On or about October 6, 2010, FBD and LeanSpa entered into a Merchant Processing Agreement (the "Merchant Agreement").  Because of its relationship to the ISO Agreement  and the breadth of the latter's  confidentiality provision,  out of an abundance of caution FBD is also seeking to file the Merchant Agreement seal. Attached as **Exhibit B** is a CM/ECF placeholder page pending action on the motion to file under seal.

31.   By accepting the terms of the Merchant Agreement, LeanSpa specifically agreed to "[m]aintaining fraud and chargebacks below established thresholds."  The threshold established for LeanSpa was one percent (1%) of interchange volume of the transactions of the merchant - i.e., monthly sales.  (Merchant Agreement ¶ 3.07.)

32.   LeanSpa also granted a security interest to FBD:

> To secure payment of Merchant's obligations under this Agreement, Merchant grants to Acquirer a security interest in all now existing or hereafter acquired:  (a) Transactions, Sales Drafts, Credit Vouchers and other items submitted to Acquirer for processing by or for Merchant; (b) accounts receivable and payment rights relating to or arising from this Agreement, including all amounts due Merchant (including any rights to receive credits or payments hereunder); (c) accounts (including without limitation all deposit accounts) maintained with the Acquirer or any institution other than Acquirer, including the Reserve Account and Operating Account, in the name of or for the benefit of, Merchant or any guarantor of Merchant's obligations under this Agreement; (d) deposits, regardless of source, to Merchant's or any guarantor's accounts with Acquirer or any

> institution other than Acquirer, including the Reserve Account;
> (e) all deposits and all other property and funds deposited by
> Merchant or withheld by Acquirer, including funds and property
> withheld as the result of security monitoring; and (f) proceeds of
> the foregoing.

(Merchant Agreement ¶ 3.16.)

33. The Merchant Agreement provides that, upon any breach by LeanSpa, FBD may take

action on securing the collateral without any further notice:

> If Acquirer reasonably determines that Merchant has breached any
> obligation under this Agreement, or that proceeds of Merchant's
> future card sales are unlikely to cover anticipated Chargebacks,
> credits, fees and adjustments, as reasonably determined by
> Acquirer (whether because this Agreement has been terminated or
> for any other reason), Acquirer may set off or otherwise exercise
> its security interest without notice or demand by immediately
> withdrawing from or freezing any account or otherwise exercising
> its rights under this Agreement or those rights available under
> applicable laws, including the Delaware Uniform Commercial
> Code, or in equity.

(Merchant Agreement ¶ 3.16.)

34. Having accepted the terms of the Merchant Agreement, LeanSpa began processing

transactions that same month in October 2010.  LeanSpa continued to process with FBD until

April 19, 2011, when it was finally terminated due to excessive chargebacks.

### LeanSpa Conceals and Masks Its Chargeback History

35. Almost immediately from the inception of the relationship with FBD, LeanSpa began

to exceed the chargeback threshold under the Merchant Agreement.  LeanSpa did, in fact, exceed

its chargeback levels for November and December 2010.

36. LeanSpa and Mizhen, however, through a series of intentional misrepresentations

and omissions, managed to prevent FBD from terminating its account.  For example, LeanSpa

promised to increase customer service availability; enhance credit/refund issuing policies;

implement shipping address verification, auto-tracking and undeliverable shipment notification;

10

undertake new marketing initiatives such as altering its reliance on affiliate marketing; switch to 4-day authorization delay; enhance its anti-fraud division; and use the services of a reputable fraud prevention and mitigation company called Verifi.  Such representations were false.

37.  Based on the above representations, FBD approved increases in LeanSpa's processing volume, enabling LeanSpa to stay below the chargeback threshold for January 2011 by increasing sales.  This was a short-lived fix, however.

38.  By the following month, February 2011, the chargebacks caught up with sales and LeanSpa, once again, exceeded its chargeback threshold.

### *LeanSpa Is Terminated by FBD*

39.  LeanSpa continued to process with FBD until April 19, 2011, when it was finally terminated due to numerous material breaches by LeanSpa. LeanSpa breached the Merchant Agreement in the following ways:

    A.  Exceeding the established chargeback threshold level;

    B.  Failing to comply with Visa's operating regulations;

    C.  Refusing to permit FBD to debit LeanSpa's account as required under the Merchant Agreement; and

    D.  Various other breaches according to proof.

40.  LeanSpa was designated to HRCMP status in five of its seven short months of processing with FBD, and caused FBD to incur chargeback handling fees to date of $1,883,550.00.

### *FBD Suffers Catastrophic Losses Which Are Growing By the Day*

41.  As a direct and proximate result of LeanSpa's and Mizhen's conduct, FBD has been subjected to more than $1.8 million in chargeback handling fees in a seven month period.  This amount is expected to grow over time.

SL1 1088424v4 106159.00002

42.   At all relevant times, Defendants Check21 and Meros aided and abetted LeanSpa's fraudulent conduct by giving substantial assistance and encouragement to LeanSpa and Mizhen in order to conceal their chargebacks, risk assessment levels, and minimum reserves.

43.   FBD has performed all conditions and obligations required of it, and LeanSpa and Mizhen have not been excused from performance of any of their obligations.

## FIRST CAUSE OF ACTION

## BREACH OF CONTRACT

### (Against LeanSpa and Mizhen)

44.   Plaintiff realleges and incorporates by reference all of the preceding paragraphs of this Complaint.

45.   The Merchant Agreement required LeanSpa to (and LeanSpa represented and warranted it would), among other things:  (a) be truthful and accurate in providing information to FBD, including reporting its merchant account history with other banks, (b) not exceed the established chargeback threshold level, (c) comply with all its obligations to consumer Cardholders in connection with their credit card transactions, and (d) comply with Visa's and other Credit Card Payment Industry Association rules and operating regulations.  (*See, e.g.*, Merchant Agreement pp. 1-3 and Terms and Conditions ¶¶ 1.10, 2.07, 2.08, 3.07, 3.12, 3.23.)

46.   In addition, the Merchant Agreement expressly states that it will be binding on and inure to the benefit of Merchant (here, LeanSpa) as well as its personal representatives, which includes Mizhen.  The Merchant Agreement also states that Merchant (here, LeanSpa) and its principals shall be jointly and severally liable for all of its obligations under the Merchant Agreement.  (*See* Merchant Agreement ¶ 3.18(B).)

47.   LeanSpa and Mizhen materially breached the Merchant Agreement in the following ways:

SL1 1088424v4 106159.00002

A. Exceeding the established chargeback threshold level;

B. Failing to comply with Visa's operating regulations;

C. Refusing to permit FBD to debit LeanSpa's account as required under the Merchant Agreement;

D. Misrepresenting to FBD that LeanSpa would increase customer service availability;

E. Misrepresenting to FBD that LeanSpa would enhance credit/refund issuing policies;

F. Misrepresenting to FBD that LeanSpa would implement shipping address verification, auto-tracking and undeliverable shipment notification;

G. Misrepresenting to FBD that LeanSpa would undertake new marketing initiatives such as altering its reliance on affiliate marketing;

H. Misrepresenting to FBD that LeanSpa would switch to 4-day authorization delay;

I. Misleading FBD to believe LeanSpa would enhance its anti-fraud division; and

J. Misrepresenting to FBD that LeanSpa would engage and use the services of a reputable fraud prevention and mitigation company called Verifi; and

K. Various other breaches according to proof.

48. Based on the conduct and misrepresentations of LeanSpa and Mizhen described above, LeanSpa was not only permitted to maintain the merchant account it acquired under the Merchant Agreement for an additional five months, but FBD actually increased LeanSpa's processing limit.

49. As a principal of LeanSpa, Mizhen is contractually jointly and severally liable with LeanSpa for all breaches of the Merchant Agreement.  (*See* Merchant Agreement ¶ 3.18(B).)

50.  FBD has performed all conditions and obligations required of it to be performed.

51.  As a direct and proximate result of LeanSpa's and Mizhen's material breaches of the Merchant Agreement, FBD has been damaged, and continues to be damaged, in a sum to be proven at trial, which sum will be in excess of $1.8 million.

52.  In addition to Mizhen's personal liability under the express terms of the Merchant Agreement, Mizhen is liable to FBD for the full amount of the damages sought in this claim as a principal and alter-ego of LeanSpa.  Mizhen is doing business as LeanSpa and LeanSpa is an alter ego of Mizhen in that there is such a unity of interest between the LeanSpa and Mizhen that they are indistinguishable from one another.  Facts in support of this contention include LeanSpa is inadequately capitalized and staffed, does not regularly maintain corporate meetings and minutes, comingles funds, and does not respect corporate formalities.  As such, an inequitable result would occur if LeanSpa and Mizhen are not treated as one and the same.

53.  As a direct and proximate result of LeanSpa's and Mizhen's conduct, FBD has retained the services of legal counsel to pursue this action, thereby incurring costs, legal fees, and other fees and expenses in the pursuit of this action and the defense of the demands for payments, fines, and assessments made against FBD.  FBD is contractually entitled to recover as damages all of its costs and legal fees when the final amount becomes known to FBD. (Merchant Agreement ¶ 3.18(F).)

54.  LeanSpa's and Mizhen's conduct described above was intended to cause injury or was despicable conduct carried on by LeanSpa and Mizhen with a willful, reckless and/or conscious disregard of FBD's rights, and/or was undertaken by LeanSpa and Mizhen with the intent to deprive FBD of its property, legal rights, or to otherwise cause injury, such as to

constitute malice, oppression, or fraud, thereby entitling FBD to punitive damages in an amount appropriate to punish or set an example of LeanSpa and Mizhen.

## SECOND CAUSE OF ACTION

## SPECIFIC PERFORMANCE FOR DELIVERY OF COLLATERAL

### (Against LeanSpa and Mizhen)

55.  Plaintiff realleges and incorporates by reference all of the preceding paragraphs of this Complaint.

56.  Beginning on or about October 6, 2010, and continuing to the present, FBD retained and continues to retain a security interest in the following belonging to LeanSpa:

> [I]n all now existing or hereafter acquired:  (a) Transactions, Sales Drafts, Credit Vouchers and other items submitted to Acquirer for processing by or for Merchant; (b) accounts receivable and payment rights relating to or arising from this Agreement, including all amounts due Merchant (including any rights to receive credits or payments hereunder); (c) accounts (including without limitation all deposit accounts) maintained with the Acquirer or any institution other than Acquirer, including the Reserve Account and Operating Account, in the name of or for the benefit of, Merchant or any guarantor of Merchant's obligations under this Agreement; (d) deposits, regardless of source, to Merchant's or any guarantor's accounts with Acquirer or any institution other than Acquirer, including the Reserve Account; (e) all deposits and all other property and funds deposited by Merchant or withheld by Acquirer, including funds and property withheld as the result of security monitoring; and (f) proceeds of the foregoing.

(*See* Merchant Agreement ¶ 3.16(B).)

57.  As a result of LeanSpa's and Mizhen's material breaches of the Merchant Agreement and Mizhen's status as the sole principal and alter ego of LeanSpa, FBD is entitled to take immediate possession of that portion of accounts receivable, payment rights, accounts and deposits that LeanSpa and Mizhen have with any and all institutions.  FBD has demanded possession or disbursement of said accounts receivable, payment rights, accounts and deposits

SL1 1088424v4 106159.00002

from LeanSpa and Mizhen, but LeanSpa and Mizhen have wrongfully refused to give FBD possession or to disburse the security described above.

58.  At all times herein mentioned, the amount of the security described above is unknown at this time but FBD makes a claim for the entirety of said security in an amount up to $1.8 million or such further amount to be proven at trial.

## THIRD CAUSE OF ACTION

## CONSTRUCTIVE TRUST

### (Against LeanSpa and Mizhen)

59.  Plaintiff realleges and incorporates by reference all of the preceding paragraphs of this Complaint.

60.  As alleged above, LeanSpa and Mizhen have materially breached the terms of the Merchant Agreement.

61.  LeanSpa and Mizhen possess tangible real and/or personal properties and assets including, but not limited to, accounts receivable, payment rights, accounts and deposits with other banking institutions.  FBD, pursuant to section 3.16 of the Merchant Agreement, has a security interest in said real and tangible properties and assets.

62.  FBD has no adequate remedy at law and has suffered and will continue to suffer irreparable harm and damage as a result of LeanSpa's and Mizhen's acts above.  LeanSpa and Mizhen hold and/or maintain control of those tangible real and/or personal properties and assets as constructive trustees for the benefit of FBD, in an amount to be determined at trial.

SL1 1088424v4 106159.00002

**FOURTH CAUSE OF ACTION**

**BREACH OF CONTRACT**

**(Against Check21 and Meros)**

63.  Plaintiff realleges and incorporates by reference all of the preceding paragraphs of this Complaint.

64.  Under the ISO Agreement, Check21 and Meros were responsible for the following:

A.  Conducting due diligence on each potential merchant who completes a merchant agreement with FBD to ensure that the merchant satisfies the requirements for merchant services with FBD.  (ISO Agreement at "Schedule D".)

B.  Monitoring the adequacy of the LeanSpa's reserve account with FBD and immediately notifying FBD if the amount is inadequate.  (ISO Agreement ¶ 3.2.)

C.  Monitoring LeanSpa's account "in order to detect unusual or unacceptable trends" in LeanSpa's sales activity and recommending to FBD to hold funds, suspend service, or cancel the Merchant Agreement.  (ISO Agreement ¶ 4.7.)

D.  Notifying FBD as soon as it becomes aware of any information that negatively reflects on LeanSpa.  (ISO Agreement ¶ 4.8.).

E.  Being responsible for "losses of Merchants [LeanSpa] or amounts owing to FBD or any Association for any reason including merchant fraud, chargebacks, bankruptcy, violations of Applicable Law, Information security practices or otherwise."  (ISO Agreement ¶ 4.10.)

65.  Check21 and Meros materially breached the ISO Agreement in the following ways:

A.  Failing to conduct due diligence LeanSpa to ensure that LeanSpa satisfied the requirements for merchant services with FBD;

B.  Failing to monitor the adequacy of the LeanSpa's reserve account with FBD;

17

    C.  Failing to immediately notify FBD that the reserve amount was inadequate, despite being aware of the same;

    D.  Failing to monitor LeanSpa's account "in order to detect unusual or unacceptable trends" in LeanSpa's sales activity, which was apparent from the first month of service when in November LeanSpa breached its chargeback threshold;

    E.  Failing to recommend to FBD to hold funds, suspend service, or cancel the Merchant Agreement;

    F.  Failing to pay for all amounts owing to FBD as a result of LeanSpa's fraud and chargebacks; and

    G.  Various other breaches, according to proof.

66.  As explained above, Meros, as a principal and sales agent for Check21, is personally responsible for complying with the ISO Agreement.  (ISO Agreement ¶ 1.7, p. 22, and "Schedule F".)

67.  FBD has performed all conditions and obligations required of it to be performed under the ISO Agreement.

68.  As a direct and proximate result of Check21's and Meros's material breaches of the ISO Agreement, FBD has been damaged, and continues to be damaged, in a sum to be proven at trial, which sum will be in excess of $1.8 million.

69.  In addition to Meros's personal liability under the express terms of the ISO Agreement, Meros is liable to FBD for the full amount of the damages sought in this claim as a principal and alter-ego of Check21.  Meros is doing business as Check21 and Check21 is an alter ego of Meros in that there is such a unity of interest between the Check21 and Meros that they are indistinguishable from one another.  Facts in support of this contention include Check21 is

18

inadequately capitalized and staffed, does not regularly maintain corporate meetings and minutes, comingles funds, and does not respect corporate formalities.  As such, an inequitable result would occur if Check21 and Meros are not treated as one and the same.

## FIFTH CAUSE OF ACTION

## EXPRESS CONTRACTUAL INDEMNITY

### (Against Check21 and Meros)

70.  Plaintiff realleges and incorporates by reference all of the preceding paragraphs of this Complaint.

71.  The ISO Agreement requires that Check21 indemnify and hold harmless FBD from and against any and all losses arising out of the ISO Agreement.

72.  Specifically, the ISO Agreement provides:

> ISO will indemnify and hold FBD harmless from and against ***any and all*** claims, damages, fines, demands, judgments, injunctions or losses suffered or incurred by FBD (including attorneys fees and costs) (the "Losses") in connection with ***any*** (i) Merchant of ISO, including, without limitation, Losses associated with purchases that are charged back to, and not paid by, a Merchant, fines, fees, assessments, penalties, expenses or any other charge assessed by any Association relating to any Merchant, and losses arising out of any breach of a Merchant Agreement by a Merchant . . . .

> [¶]

> ISO will indemnify and hold FBD and the Associations harmless from and against any and all Losses arising out of or relating to any breach by ISO of its representations, warranties or agreements under this Agreement or arising out of any act or omission by ISO . . . .

(ISO Agreement ¶¶ 7.1 and 7.3) (emphasis added).)

73.  The ISO Agreement further provides that Check21 shall be responsible for "losses of Merchants [LeanSpa] or amounts owing to FBD or any Association for any reason including

19

merchant fraud, chargebacks, bankruptcy, violations of Applicable Law, Information security

practices or otherwise."  (ISO Agreement ¶ 4.10.)

74.  FBD has suffered claims, damages, fines, demands, fees, assessments and losses in

connection with LeanSpa, a merchant of Check21, and as a result of Check21's and Meros's

material breaches of the ISO Agreement.

75.  By this Complaint, FBD demands full indemnity for all claims, damages, fines,

demands, fees, assessments and losses it has suffered and will suffer as a direct and proximate

result of Check21's and Meros's conduct described above.

76.  As a direct and proximate result of Check21's and Meros's conduct, FBD has

retained the services of legal counsel to pursue this action, thereby incurring costs, legal fees, and

other fees and expenses in the pursuit of this action and the defense of the demands for

payments, fines, and assessments made against FBD.  FBD is legally entitled to recover as

damages all of its costs and legal fees when the final amount becomes known to FBD.  (ISO

Agreement ¶ 7.1.)

77.  In addition to Meros's personal liability under the express terms of the ISO

Agreement, Meros is liable to FBD for the full amount of the damages sought in this claim as a

principal and alter-ego of Check21.  Meros is doing business as Check21 and Check21 is an alter

ego of Meros in that there is such a unity of interest between the Check21 and Meros that they

are indistinguishable from one another.  Facts in support of this contention include Check21 is

inadequately capitalized and staffed, does not regularly maintain corporate meetings and

minutes, comingles funds, and does not respect corporate formalities.  As such, an inequitable

result would occur if Check21 and Meros are not treated as one and the same.

## SIXTH CAUSE OF ACTION

## IMPLIED INDEMNITY

### (Against Check21 and Meros)

78.  Plaintiff realleges and incorporates by reference all of the preceding paragraphs of this Complaint.

79.  At all relevant times, Check21 was contractually obligated to FBD to perform certain services under the ISO Agreement.  As a result of this contractual relationship, an implied obligation to discharge foreseeable damages resulting from improper performance or breach of the ISO Agreement existed.

80.  In the event FBD suffers any Losses (as defined in the ISO Agreement) and is obligated to pay any sums to any third party as a result of Check21's and Meros's failure to perform under the ISO Agreement, Check21 and Meros are obligated to fully indemnify and hold harmless FBD from any such Losses.

81.  FBD is entitled to full reimbursement from Check21 and Meros for all Losses and all costs and fees incurred.

82.  As a direct and proximate result of Check21's and Meros's conduct, FBD has retained the services of legal counsel to pursue this action, thereby incurring costs, legal fees, and other fees and expenses in the pursuit of this action and the defense of the demands for payments, fines, and assessments made against FBD.  FBD is legally entitled to recover as damages all of its costs and legal fees when the final amount becomes known to FBD.  (ISO Agreement ¶ 7.1.)

83.  In addition to Meros's personal liability under the express terms of the ISO Agreement, Meros is liable to FBD for the full amount of the damages sought in this claim as a principal and alter-ego of Check21.  Meros is doing business as Check21 and Check21 is an alter

21

ego of Meros in that there is such a unity of interest between the Check21 and Meros that they are indistinguishable from one another.  Facts in support of this contention include Check21 is inadequately capitalized and staffed, does not regularly maintain corporate meetings and minutes, comingles funds, and does not respect corporate formalities.  As such, an inequitable result would occur if Check21 and Meros are not treated as one and the same.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter an order or judgment against the Defendants as follows:

1.  Against all Defendants, for an award of general and special damages in an amount in excess of $1.8 million, according to proof;

2.  Against the LeanSpa and Mizhen, for possession of the property and assets secured under section 3.16 of the Merchant Agreement;

3.  Against LeanSpa and Mizhen, for an award of punitive damages;

4.  Against Check21 and Meros, for indemnity for all amounts owed by LeanSpa and Mizhen;

5.  Against all Defendants, for an award of attorneys' fees and costs; and

6.  Such other and further relief as the Court may deem just and proper.

SL1 1088424v4 106159.00002

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this action on all claims so triable.

Dated:  August 1, 2011                    **STEVENS & LEE P.C.**


*/s/ Joseph H. Huston, Jr.*
Joseph H. Huston, Jr. (No. 4035)
Maria Aprile Sawczuk (No. 3320)
1105 North Market Street, 7th Floor
Wilmington, DE 19801
Telephone:  (302) 425-3310; -3306
Facsimile:   (610) 371-7972; (610) 988-0838
E-mail: jhh/masa@stevenslee.com


-and-


Daniel B. Huyett
Jeffrey D. Bukowski
111 North Sixth Street
Reading, PA 19603-0679
Telephone:  (610) 478-2219; (610) 478-2215
Facsimile:   (610) 988-0801; (610) 478-0805
E-mail: dbh/ jdb@stevenslee.com


-and-

Theodore F. Monroe
**LAW OFFICES OF THEODORE F. MONROE**
801 South Figueroa Street, 12th Floor
Los Angeles, California  90017
Telephone:  (213) 233-2272
Facsimile:  (213) 622-1444
monroe@tfmlaw.com


*Attorneys for Plaintiff First Bank of Delaware*

23