IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FIRST BANK OF DELAWARE, a Delaware corporation, <br><br> Plaintiff, <br><br> v. <br><br> LEANSPA, LLC, a Connecticut limited liability company, BORIS MIZHEN, CHECK21.COM, LLC, a Florida limited liability company, and IDO MEROS. <br><br> Defendants. | C.A. NO. 11-675 (SLR) |

## FIRST AMENDED COUNTERCLAIMS OF DEFENDANT CHECK21.COM, LLC

By and through its undersigned counsel Defendant/Counterclaim Plaintiff Check21.com, LLC ("Check21") asserts the following amended counterclaims against Plaintiff/Counterclaim Defendant First Bank of Delaware ("FBD") in accordance with Federal Rule of Civil Procedure 15(a)(1)(B) as follows:

### THE PARTIES

1. Counter-plaintiff Check21.com LLC ("Counter-Plaintiff" or "Check21") is a Florida limited liability company, organized under the laws of the State of Florida, and maintains its administrative office in the State of Florida.

2. Counter-defendant First Bank of Delaware ("Counter-Defendant" or "FBD") is a commercial bank, chartered under the laws of the State of Delaware, and maintains an office for business in the State of Delaware.

## JURISDICTION AND VENUE

3. FBD submitted itself to the jurisdiction of this forum in connection with the counterclaims alleged *infra* when it filed this action.

4. This Court has subject matter jurisdiction over the counterclaims stated herein pursuant to Federal Rule of Civil Procedure 13(a) and 28 U.S.C. § 1332(a)(1) because the counterclaim parties are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs. Venue is proper pursuant to 28 U.S.C. § 1391(a).

## FACTUAL BACKGROUND

5. Check21 is a financial transaction service provider (commonly known in the credit card processing industry as an Independent Sales Organization or "ISO").

6. FBD is a full service, state-chartered bank that offers merchant banking services to qualifying businesses.

7. In the weeks leading up to March 2010, representatives from Check21 and FBD met to discuss the possibility of Check21 entering into a business relationship with FBD, which included a potential ISO relationship with FBD. These FBD representatives included FBD's then-CEO, Alonzo Primus, Ed Santosusso, a former FBD Vice President, Sian Bastable, a former FBD Vice President, and Lisa Vandercook, a former FBD employee. Upon information and belief, FBD terminated all of these employees during FBD's contractual relationship with Check21.

8. Specifically, on or about January 6, 2010, FBD representatives Primus, Santosusso, Bastable, and Vandercook met with Check21 representative Ido Meros at FBD's office in Philadelphia, Pennsylvania.

9. During this meeting, Check21 demonstrated its software for FBD and explained the integration of its check processing systems. For their part, Primus, Santosusso, and Bastable represented to Check21 that FBD had the ability to handle Check21's processing without creating any disruptions or problems for Check21 and its merchants.

10. Soon after, on February 18, 2010, intent on closing a deal with Check21, Primus, Santosusso and Vandercook traveled to Check21's offices in Florida and met with Check21 representatives Ido Meros, Chris Rodriquez, and Michael Ginzburg. At this meeting, Primus and Santosusso repeated their prior representations to Check21 that FBD had an experienced and knowledgeable staff in place that was capable of competently carrying out the credit card and check processing services that were eventually set forth in the ISO Agreement.

11. At the same time, further promoting the extent of FBD's illusory capabilities in the credit card space, Primus and Santosusso assured Check21 that FBD was well-equipped to fully comply with the established industry practices and regulations that would later be set forth in the Rules stated in the ISO Agreement.

12. In the course of the February 18 meeting, Primus and Santosusso told Check21 that FBD was experienced in the specialized area of merchant ISO relationships, in handling transactions related to the acquisition, and clearing and settling credit and debit transactions using VISA, MasterCard, Discover and other credit and debit cards (collectively, the "Card Companies'). Check21 would later learn that FBD had grossly oversold its shallow capabilities in these vital areas.

13. At the same February 18 meeting, FBD led Check21 to believe that FBD had sufficient know-how, infrastructure and personnel to manage the relationship, and would assign competent and ethical FBOD employees to administer, oversee and manage the relationship.

14. On March 2, 2010, Check21 and FBD entered into a Merchant ISO Agreement (as amended, the "ISO Agreement").

15. Under the ISO Agreement, Check21 was required to perform certain duties, including (i) conducting due diligence on each potential merchant who completed a merchant agreement with FBD; (ii) monitoring the accuracy of the merchant's reserve account with FBD for adequacy and any "unusual or unacceptable trends" in the merchant's sales activity; (iii) notifying FBD of any information that reflects negatively on the merchant; and (iv) indemnifying FBD for certain losses caused by the merchant and as defined in the ISO Agreement. Check21 dutifully satisfied these obligations.

16. For its part under the ISO Agreement, FBD was to sponsor Check21 as an ISO with the Card Companies, and (i) act as a liaison between Check21 and the Card Companies, which required FBD to promptly forward to Check21 all communications that FBD received from the Card Companies that related to Check21 or any merchant that Check21 referred to FBD, and (ii) cooperate with Check21 in obtaining necessary registrations and approvals that may be required from the Card Companies from time to time.

17. The ISO Agreement also required FBD to act at all times in compliance with the various rules established by the Card Companies with regard to merchant processing transactions, and all other credit and debit card-related transactions (the "Rules").

18. On or about March 2, 2011, FBD and Check21 amended the ISO Agreement to provide that FBD would establish a reserve account to offset chargebacks, fines, penalties any minimums that were not satisfied by the merchants' referred to FBD by Check21 ("Referred Merchants") settlement and/or reserve accounts (the "ISO Reserve Account").

19. The ISO Agreement provides that the amount of funds held in the ISO Reserve Account could not be modified without justification and at least thirty (30) days prior written notice by FBD.

20. In addition, the funds held in the ISO Reserve Account were to be reviewed and either increased or decreased by FBD on at least a quarterly basis.

21. Under Article 8 of the ISO Agreement, FBD was and remains required to pay Check21 commissions for the services it rendered to FBD. Section 8.5 of the ISO Agreement specifically provides that FBD's obligation to satisfy all payments owed to Check21 survives the expiration or termination of the ISO Agreement.

22. Before terminating the ISO Agreement, FBD generated and sent to Check21 monthly commissions reports. In keeping with its obligations under the ISO Agreement, for a period of time FBD paid Check21 the due and owing commissions based on the commissions reports.

23. These payments eventually stopped, however. FBD has not made any payments to Check21 since May 20, 2011. This is despite the fact that FBD's own commissions reports showed FBD owing Check21 commissions from April through August, 2011.

24. Accordingly, in violation of the ISO Agreement, FBD is in arrearages in its commissions' payments to Check21 in an amount exceeding $217,375.00.

25. On February 18, 2010, during the meeting at Check21's offices in Florida, Check21 and FBD entered into a Referral and Support Agreement (the "Referral Agreement"). In accordance with Section 2(b) of the Referral Agreement, Check21 deposited $50,000.00 into a non-interest bearing account held by FBD (the "Check21 Reserve Account") so that FBD could cover any losses not covered by customer reserve accounts. Section 2(b) further provides that

within 100 days of the termination of the Referral Agreement, FBD shall return all unused funds maintained in the Check21 Reserve Account.

26. On or about April 28, 2011, FBD terminated the Referral Agreement.

27. Upon information and belief, the $50,000.00 Check21 deposited into the Check21 Reserve Account was not utilized by FBD and remains intact.

28. FBD has failed to return the unused funds in the Check21 Reserve Account in violation of Section 2(b) of the Referral Agreement.

29. Check21 has been damaged as a result of FBD's improper actions and breaches of its contractual obligations in an amount to be proven at trial and no less than $267,375.00.

## COUNT I
## FRAUD IN THE INDUCEMENT

30. Counter-Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs 1 through 29 of this Counterclaim as if fully set forth herein.

31. In numerous conversations and communications with Check21 leading up to the execution of the ISO Agreement, FBD's senior management team notified Check21 that FBD was experienced in ISO relationships, and that FBD would provide Check21 with access to FBD employees who were ethical, experienced and knowledgeable in ISO- and merchant-type business relationships.

32. Specifically, during the January 6, 2010 meeting in Philadelphia, Primus, Santosusso, and Bastable falsely represented to Meros that FBD was set up to competently perform processing services for Check21 and its merchants.

33. Then, on February 18, 2010, as part of FBD's continuing effort to induce Check21 to enter into an ISO engagement, FBD employees Primus, FBD's then-CEO, Santosusso, and Vandercook, traveled to Check21's offices in Florida to meet with Check21

employees Ido Meros, Chris Rodriquez, and Michael Ginzburg. During this meeting, Primus and Santosusso represented to Check21 that FBD had an experienced and knowledgeable staff in place that was capable of competently carrying out the credit card and check processing services that were eventually set forth in the ISO Agreement.

34. At the same February 18 meeting, further promoting the extent of FBD's illusory capabilities in the credit card space, Primus and Santosusso assured Check21 that FBD would fully comply with the established industry practices and regulations as would later be set forth in the Rules stated in the ISO Agreement.

35. When FBD's then-CEO and other high-ranking employees made these representations to Check21, they knew or should have known that FBD (i) was not sufficiently experienced in ISO-type transactions to perform its obligations under the ISO Agreement, (ii) was not sufficiently experienced in ISO-type transactions to properly administer agreements between FBD and Referred Merchants, and (iii) was not sufficiently supervised, which created an environment in which one or more of FBD's then-corporate officers could (and did) break the Rules and/or completely ignore the Rules.

36. Primus and Santosusso made these representations to Check21 with the intent of inducing Check21's reliance on such representations so that Check21 would enter into the ISO Agreement with FBD.

37. Upon information and belief, not long after the ISO Agreement was executed FBD decided to exit the credit card processing business. At the same time, and no doubt in recognition of the demonstrable incompetence of the credit card division's personnel, FBD fired all or substantially all of the members of its senior management team, including Primus. These

were the same employees that misrepresented FBD's capabilities to Check21 and ineptly managed the Check21 relationship.

38. In deciding to enter into the ISO Agreement, Check21 reasonably and justifiably relied on the representations made by Primus, Santosusso and other members of FBD's senior management team. FBD, a chartered financial institution, held itself out to Check21 as having sufficient know-how, infrastructure and personnel to perform its obligations under the ISO Agreement. Check21 could not have learned that the representations made by the then-senior management of a chartered bank were false.

39. At the time FBD made these representations to Check21, FBD knew or should have known that FBD did not possess the requisite infrastructure, in terms of workforce or technology, to provide adequate and satisfactory services to Check21.

40. Only after the ISO Agreement was executed was it revealed to Check21 that FBD's employees did not have the ethics, experience or requisite knowledge to perform satisfactorily FBD's duties and obligations under the ISO Agreement. Even after Meros repeatedly called FBD's failures to the attention of its senior management, Primus falsely or recklessly promised that FBD would promptly remedy the problems and satisfactorily perform its obligations under the ISO Agreement. However, given FBD's utter lack of experience, infrastructure and talent in the credit card processing arena, Primus knew or should have known that FBD was incapable of carrying out such promises.

41. As a result of FBD's deficiencies, Check21 experienced numerous problems with FBD throughout the term of the ISO Agreement. More specifically, FBD employees repeatedly (i) failed to keep Check21 timely apprised of notifications from the Card Companies, (ii) failed to keep Check21 timely apprised of transactions that materially and negatively affected the

merchants that Check21 referred to FBD ("Referred Merchants"), (iii) failed to provide financial records to Check21 concerning the Referred Merchants, (iv) improperly comingled Check21's funds with the funds of third parties, and (iv) provided false and misleading information to the Card Companies concerning one or more of the Referred Merchants.

42. Had Check21 known that FBD was either unwilling or incapable of fulfilling its obligations under the ISO Agreement and properly administering processing services to the Referred Merchants, Check21 would not have entered into the ISO Agreement with FBD.

43. FBD's numerous false and misleading representations to Check21 induced Check21 to enter into the ISO Agreement.

44. Check21 has been damaged as a result of FBD's improper actions in an amount to be proven at trial.

45. FBD's conduct was willful, wanton, and in bad faith. As a result, in addition to compensatory damages, Check21 is also entitled to punitive damages.

## COUNT II
## NEGLIGENT MISREPRESENTATION

46. Counter-Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs 1 through 45 of this Counterclaim as if fully set forth herein.

47. FBD had a duty to accurately and truthfully inform Check21 of its ability to fulfill its obligations under the ISO Agreement and properly administer processing services to referred merchants.

48. FBD failed to exercise reasonable care in communicating to Check21 its level of experience and capabilities in the credit card processing space.

49. Check21 reasonably and justifiably relied on the representations of Primus, FBD's then-CEO, Bastable, Santosusso and other members of its senior management team, and

had no reason to suspect that, as a chartered financial institution, FBD would be unable to perform its obligations under the ISO Agreement.

50. FBD's misrepresentations have caused Check21 damages in an amount to be proven at trial.

51. FBD acted with malice and reckless indifference toward Check21, warranting the imposition of punitive damages against FBD.

## COUNT III
## BREACH OF CONTRACT

52. Counter-Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs 1 through 51 of this Counterclaim as if fully set forth herein.

53. FBD was required to adhere strictly to the terms of the ISO Agreement, as well as all laws, statutes and regulations relevant to the parties' transactions, including but not limited to the Rules.

54. FBD intentionally, willfully and purposely violated the terms of the ISO Agreement and the Rules.

55. During the term of the ISO Agreement, FBD's then-corporate officers (i) permitted so-called "pre-paid" cards (*i.e.*, debit cards on which pre-paid amounts have been credited) to be sold by merchants using FBD's services in an unabashed attempt by FBD to keep such merchants' overall chargeback rates artificially low, and (ii) permitted FBD to offer credit card processing services to persons known to be fraudsters and/or under investigation by state and/or federal authorities for theft or organized schemes to defraud.

56. These acts were in breach of the ISO Agreement and occurred and continued to occur despite numerous oral and written warnings from Check21, which were delivered to the then-CEO of FBD.

57. In addition, throughout the term of the ISO Agreement, FBD repeatedly and intentionally violated the ISO Agreement by, among other things, (i) failing to provide Check21 with material information concerning Referred Merchants, (ii) failing to engage in adequate, accurate and proper accounting methods, resulting in the unauthorized comingling of monies between Check21 and third parties, (iii) failing to properly administer Check21's business accounts, resulting in the unauthorized removal of funds from Check21's accounts, (iv) failing to provide Check21 with a separate bank identification number (or "BIN" number) despite FBD's promises that it would do so, (v) failing to properly handle and administer the funds held in the ISO Reserve Account, and (vi) failed to keep Check21 apprised of material information affecting Check21's accounts and the accounts of the Referred Merchants.

58. FBD has also failed to make all payments due to Check21 under Article 8 of the ISO Agreement.

59. FBD's own commissions reports show that Check21 is owed commissions in excess of $217,375.00 for the period April through August, 2011.

60. FBD has not made any payments to Check21 since May 20, 2011.

61. Accordingly, FBD is in arrearages in its commissions' payments to Check21 in the amount in excess of $217,375.

62. Additionally, FBD has not refunded to Check21 any of the unutilized funds in the Check21 Reserve Account in violation of the requirement under Section 2(b) of the Referral Agreement that FBD refund Check21 all such funds within 100 days of the termination of the Referral Agreement.

63. As a result of FBD's improper activities, Check21 has been damaged in an amount to be proven at trial and an amount in excess of $267,375.00.

## COUNT IV
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

64.     Counter-Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs 1 through 63 of this Counterclaim as if fully set forth herein.

65.     At all times during the term of the ISO Agreement, each party was required to act ethically, reasonably, properly and in good faith.

66.     Virtually from the start of the ISO Agreement and continuing through the end of that agreement, FBD repeatedly and materially failed to act ethically, reasonably, properly and/or in good faith. Among other things, FBD (i) failed to properly supervise its employees, resulting in improper and unauthorized activities by certain FBD employees, including one or more corporate officers of FBD; (ii) provided Check21 with incorrect and misleading information concerning FBD's processing activities and chargeback levels of Referred Merchants, (iii) purposely and repeatedly withheld information from Check21 that FBD had received from the Card Companies, (iv) provided false and misleading information to the Card Companies concerning Check21 and/or Referred Merchants, and (v) stymied attempts by Check21 and/or the Referred Merchants to comply with the Rules. To the extent they are not expressly stated in the ISO Agreement, these obligations lie within in the penumbras of the contract.

67.     Instead of rectifying its failures, FBD turned a blind eye to the problems, which caused purposeful and intentional violations of FBD's implied obligations of good faith and fair dealing and the spirit of the ISO Agreement and the Rules.

68.     Only after FBD's improper activities came to public light did FBD begin to terminate its employees that engaged in the improper behavior—many if not all of whom worked in FBD's credit card division and contributed to the myriad problems which plagued the Check21 relationship. However, FBD failed to replace the vacated posts with competent

employees, leaving (at best) a skeletal crew to service Check21's relationship and all of the Referred Merchants' accounts.

69. FBD's purposeful lack of infrastructure, while by itself perhaps not an express breach of the letter of the ISO Agreement, placed FBD in a position where it was virtually impossible for FBD to comply with its duties and obligations under the ISO Agreement, and to properly administer and service the Referred Merchants' accounts.

70. Upon information and belief, during the term of the ISO Agreement FBD had the resources to properly staff its activities and fund its operations; however, FBD purposely kept its staffing levels low in order to maximize its profits, despite the fact that such activity resulted (and continues to result) in mistakes, confusion and unauthorized activity by FBD employees to Check21's serious detriment.

71. As a result of FBD's breaches of its implied duty of good faith and fair dealing, Check21 has been damaged in an amount to be proven at trial.

## COUNT V
## UNJUST ENRICHMENT

72. Counter-Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs 1 through 71 of this Counterclaim as if fully set forth herein.

73. In the spring of 2010, Check21 opened a checking account with FBD for the purpose of maintaining an operating account.

74. At all times relevant hereto, Check21 maintained funds in the checking account.

75. In or about May 2011, when FBD wrongfully stopped paying Check21 commissions, FBD froze Check21's checking account without prior notice to Check21. At the time, there was approximately $3,185.00 in Check21's checking account.

76. FBD has wrongfully refused to release the funds in Check21's checking account to Check21 and continues to hold those funds without justification.

77. As a result of FBD's failure to release Check21's funds maintained in its checking account, FBD has been unjustly enriched to Check21's continued detriment.

WHEREFORE, Defendant/Counter-Plaintiff Check21.com, LLC prays that this Court enter judgment as follows:

(1) finding in Defendant/Counter-Plaintiff's favor and against Plaintiff/Counter-Defendant on all counts alleged in the complaint and counterclaim;

(2) awarding Defendant/Counter-Plaintiff compensatory and consequential damages in an amount to be determined at trial;

(3) awarding Defendant/Counter-Plaintiff punitive damages for Plaintiff/Counter-Defendant's willful, wanton, and reckless conduct;

(4) awarding Defendant/Counter-Plaintiff its attorneys' fees and costs incurred in defending this action and prosecuting the counterclaims; and

(5) awarding Defendant/Counter-Plaintiff such other and further relief as the Court deems just and equitable.

**BERGER HARRIS**

By: /s/ John G. Harris
John G. Harris (DE #4017)
David B. Anthony (DE # 5452)
1201 N. Orange Street, Third Floor
Wilmington, DE 19801
Tel: (302) 655-1140
Fax: (302) 655-1131
jharris@bergerharris.com
danthony@bergerharris.com

*Attorneys for Defendants
Check21.com and Ido Meros*

OF COUNSEL:

Bradley J. Gross
2645 Executive Park Drive
Suite 119
Weston, FLA 33331
Tel: (954) 217-6225
Fax: (954) 385-9814
brad@bradleygross.com

Dated: November 10, 2011
Wilmington, Delaware