IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FIRST BANK OF DELAWARE,
a Delaware corporation,

        Plaintiff/Counterclaim Defendant,

        v.

LEANSPA, LLC,
a Connecticut limited liability company,
CHECK21.COM, LLC,
a Florida limited liability company,

        Defendants/Counterclaim Plaintiffs,

BORIS MIZHEN, and IDO MEROS.

        Defendants.

C.A. NO. 11-675 (SLR)

LEANSPA, LLC'S
ANSWER, DEFENSES AND AMENDED COUNTERCLAIMS

Defendant/Counterclaim Plaintiff LeanSpa, LLC ("LeanSpa") states for its answer and defenses to the Complaint filed by First Bank of Delaware ("FBD" or "Plaintiff") as follows:

1. The first sentence of paragraph 1 of the Complaint consists of a summary of relief sought by the Plaintiff which does not require a responsive pleading. To the extent it does require a responsive pleading, LeanSpa denies the allegations set forth in the first sentence of paragraph 1. LeanSpa lacks information and knowledge sufficient to admit or deny the remaining allegations set forth in paragraph 1 of the Complaint.

2. LeanSpa denies the allegations set forth in paragraph 2 of the Complaint.

3. LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 3 of the Complaint.

4.      LeanSpa denies the allegations set forth in paragraph 4 of the Complaint.

PARTIES

5.      LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 5 of the Complaint.

6.      LeanSpa admits the allegations set forth in paragraph 6 of the Complaint.

7.      LeanSpa admits the allegations set forth in paragraph 7 of the Complaint.

8.      LeanSpa denies the allegations set forth in paragraph 8 of the Complaint.

9.      LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 9 of the Complaint.

10.      LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 10 of the Complaint.

11.      LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 11 of the Complaint.

JURISDICTION AND VENUE

12.      Paragraph 12 of the Complaint contains a legal conclusion for which no response is required.  To the extent a response is required, LeanSpa admits that it is a limited liability company organized under the laws of the State of Connecticut.  LeanSpa lacks information and knowledge sufficient to admit or deny the remaining allegations set forth in paragraph 12 of the Complaint.

13.      Paragraph 13 of the Complaint contains a legal conclusion for which no response is required.  To the extent a response is required, LeanSpa admits that it has either transacted business or performed work or service in the State of Delaware.  LeanSpa also admits that the contract that it is a party to that is at issue in this action contains a forum selection clause

favoring Delaware as the situs of any litigation arising out of such contract. LeanSpa lacks information and knowledge sufficient to admit or deny the remaining allegations set forth in paragraph 13 of the Complaint.

14.     Paragraph 14 of the Complaint contains a legal conclusion for which no response is required. To the extent a response is required, LeanSpa admits the allegations set forth in paragraph 14 of the Complaint.

## FACTUAL BACKGROUND

### First Bank of Delaware

15.     LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 15 of the Complaint.

### LeanSpa and Mizhen

16.     LeanSpa denies the allegations set forth in paragraph 16 of the Complaint.

17.     LeanSpa admits that it marketed a proprietary supplement product to support weight loss and that it marketed the product through affiliates. LeanSpa denies the remaining allegations set forth in paragraph 17 of the Complaint.

18.     LeanSpa admits that it advertised its products online. LeanSpa denies the remaining allegations set forth in paragraph 18 of the Complaint.

19.     LeanSpa admits that it offered its products on a 14-day trial basis. LeanSpa admits that those customers of LeanSpa that elected to continue to receive LeanSpa's products in continuous shipments were billed on a continuity basis for those products. By way of further response, LeanSpa's website required customers to check a box after reviewing the terms and conditions of the sales contract, including the fact that they were signing up for continuity billing, prior to placing an order. LeanSpa allowed customers to cancel their orders during the

trial period by calling a designated 1-800 number or through an online cancellation process. LeanSpa utilized the premier brand protection company, Brand Protection Services, to audit and monitor LeanSpa's website to ensure that LeanSpa was in full compliance with all continuity merchant rules and regulations.  LeanSpa denies the remaining allegations set forth in paragraph 19 of the Complaint.

20.    LeanSpa denies the allegations set forth in paragraph 20 of the Complaint.  By way of further answer, LeanSpa admits that it is no longer processing or accepting new orders for its product.

21.    LeanSpa denies the allegations set forth in the first sentence of paragraph 21 of the Complaint.  LeanSpa lacks information and knowledge sufficient to admit or deny the remaining allegations set forth in paragraph 21 of the Complaint

22.    LeanSpa denies the allegations set forth in paragraph 22 of the Complaint.  By way of further answer, LeanSpa admits that Microsoft initiated a lawsuit in the Western District of Washington against Mizhen and others under the CAN-SPAM Act.

23.    LeanSpa admits the allegations set forth in paragraph 23 of the Complaint.

24.    LeanSpa admits the allegations set forth in paragraph 24 of the Complaint.

25.    LeanSpa denies the allegations set forth in paragraph 25 of the Complaint.

<u>Check21 Refers LeanSpa to FBD</u>

26.    LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 26 of the Complaint.

27.    LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 27 of the Complaint.

28.     LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 28 of the Complaint.

29.     LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 29 of the Complaint.

<u>LeanSpa Applies For Merchant Banking Services With FBD But Conceals Critical Information</u>

30.     LeanSpa admits the allegations set forth in the first sentence of paragraph 30 of the Complaint.   LeanSpa lacks information and knowledge sufficient to admit or deny the remaining allegations set forth in paragraph 30 of the Complaint.

31.     LeanSpa respectfully refers the Court to the Merchant Agreement referenced in paragraph 31 of the Complaint for a full and complete statement of its contents, and LeanSpa denies any allegations in paragraph 31 of the Complaint contrary to the terms of the Merchant Agreement.

32.     LeanSpa respectfully refers the Court to the Merchant Agreement referenced in paragraph 32 of the Complaint for a full and complete statement of its contents, and LeanSpa denies any allegations in paragraph 32 of the Complaint contrary to the terms of the Merchant Agreement.

33.     LeanSpa respectfully refers the Court to the Merchant Agreement referenced in paragraph 33 of the Complaint for a full and complete statement of its contents, and LeanSpa denies any allegations in paragraph 33 of the Complaint contrary to the terms of the Merchant Agreement.

34.     LeanSpa admits that it began processing transactions through FBD in October 2010.  LeanSpa denies the remaining allegations set forth in paragraph 34 of the Complaint.

<u>LeanSpa Conceals and Masks Its Chargeback History</u>

35.     LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 35 of the Complaint.

36.     LeanSpa denies the allegations set forth in paragraph 36 of the Complaint.

37.     LeanSpa admits that FBD approved increases in LeanSpa's processing volume on multiple occasions, but denies the remaining allegations set forth in paragraph 37 of the Complaint.

38.     LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 38 of the Complaint.

<u>LeanSpa Is Terminated by FBD</u>

39.     LeanSpa denies the allegations set forth in paragraph 39 of the Complaint.

40.     LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 40 of the Complaint.

<u>FBD Suffers Catastrophic Losses Which Are Growing By the Day</u>

41.     LeanSpa denies the allegations set forth in paragraph 41 of the Complaint.

42.     LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 42 of the Complaint.

43.     LeanSpa denies the allegations set forth in paragraph 43 of the Complaint.

<u>FIRST CAUSE OF ACTION</u>
<u>BREACH OF CONTRACT</u>
(Against LeanSpa and Mizhen)

44.     LeanSpa incorporates by reference, as if fully set forth herein, its responses to paragraphs 1 to 43 of the Complaint.

45.     LeanSpa respectfully refers the Court to the Merchant Agreement referenced in paragraph 45 of the Complaint for a full and complete statement of its contents, and LeanSpa denies any allegations in paragraph 45 of the Complaint contrary to the terms of the Merchant Agreement.

46.     LeanSpa respectfully refers the Court to the Merchant Agreement referenced in paragraph 46 of the Complaint for a full and complete statement of its contents, and LeanSpa denies any allegations in paragraph 46 of the Complaint contrary to the terms of the Merchant Agreement.

47.     LeanSpa denies the allegations set forth in paragraph 47 of the Complaint.

48.     LeanSpa denies the allegations set forth in paragraph 48 of the Complaint.

49.     LeanSpa denies the allegations set forth in paragraph 49 of the Complaint.

50.     LeanSpa denies the allegations set forth in paragraph 50 of the Complaint.

51.     LeanSpa denies the allegations set forth in paragraph 51 of the Complaint.

52.     LeanSpa denies the allegations set forth in paragraph 52 of the Complaint.

53.     LeanSpa denies the allegations set forth in paragraph 53 of the Complaint.

54.     LeanSpa denies the allegations set forth in paragraph 54 of the Complaint.

SECOND CAUSE OF ACTION

SPECIFIC PERFORMANCE FOR DELIVERY OF COLLATERAL

(Against LeanSpa and Mizhen)

55.     LeanSpa incorporates by reference, as if fully set forth herein, its responses to paragraphs 1 to 54 of the Complaint.

56.     LeanSpa respectfully refers the Court to the Merchant Agreement referenced in paragraph 56 of the Complaint for a full and complete statement of its contents, and LeanSpa

denies any allegations in paragraph 56 of the Complaint contrary to the terms of the Merchant Agreement.

57.     LeanSpa denies the allegations set forth in paragraph 57 of the Complaint.

58.     LeanSpa denies the allegations set forth in paragraph 58 of the Complaint.

THIRD CAUSE OF ACTION

CONSTRUCTIVE TRUST

(Against LeanSpa and Mizhen)

59.     LeanSpa incorporates by reference, as if fully set forth herein, its responses to paragraphs 1 to 58 of the Complaint.

60.     LeanSpa denies the allegations set forth in paragraph 60 of the Complaint.

61.     LeanSpa admits the allegations set forth in the first sentence of paragraph 61 of the Complaint.  LeanSpa respectfully refers the Court to the Merchant Agreement referenced in the second sentence of paragraph 61 of the Complaint for a full and complete statement of its contents, and LeanSpa denies any allegations contained in the second sentence of paragraph 61 of the Complaint contrary to the terms of the Merchant Agreement.

62.     LeanSpa denies the allegations set forth in paragraph 62 of the Complaint.

FOURTH CAUSE OF ACTION

BREACH OF CONTRACT

(Against Check21 and Meros)

63.     LeanSpa incorporates by reference, as if fully set forth herein, its responses to paragraphs 1 to 62 of the Complaint.

64.     LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 64 of the Complaint.

65.     LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 65 of the Complaint.

66.     LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 66 of the Complaint.

67.     LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 67 of the Complaint.

68.     LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 68 of the Complaint.

69.     LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 69 of the Complaint.

FIFTH CAUSE OF ACTION

EXPRESS CONTRACTUAL INDEMNITY

(Against Check21 and Meros)

70.     LeanSpa incorporates by reference, as if fully set forth herein, its responses to paragraphs 1 to 69 of the Complaint.

71.     LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 71 of the Complaint.

72.     LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 72 of the Complaint.

73.     LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 73 of the Complaint.

74.     LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 74 of the Complaint.

75.     LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 75 of the Complaint.

76.     LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 76 of the Complaint.

77.     LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 77 of the Complaint.

SIXTH CAUSE OF ACTION

IMPLIED INDEMNITY

(Against Check21 and Meros)

78.     LeanSpa incorporates by reference, as if fully set forth herein, its responses to paragraphs 1 to 77 of the Complaint.

79.     LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 79 of the Complaint.

80.     LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 80 of the Complaint.

81.     LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 81 of the Complaint.

82.     LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 82 of the Complaint.

83.     LeanSpa lacks information and knowledge sufficient to admit or deny the allegations set forth in paragraph 83 of the Complaint.

Answering the Prayer for Relief following paragraph 83 of the Complaint, LeanSpa denies that Plaintiff is entitled to any relief requested, and specifically denies that Plaintiff is entitled to the relief requested in paragraphs 1, 2, 3, and 5.

FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

FBD's claims are barred by the doctrines of acquiescence, ratification and/or waiver.

## THIRD AFFIRMATIVE DEFENSE

FBD's claims are barred by the doctrine of unclean hands.

## FOURTH AFFIRMATIVE DEFENSE

FBD's claims are barred by its failure to mitigate its damages.

## FIFTH AFFIRMATIVE DEFENSE

FBD's claims are barred by the doctrine of estoppel.

## SIXTH AFFIRMATIVE DEFENSE

FBD's claims are barred by Plaintiff's negligence and/or intentional misconduct.

## SEVENTH AFFIRMATIVE DEFENSE

FBD's claim for punitive damages asserted against LeanSpa fails to state a claim upon which relief can be granted.

## EIGHTH AFFIRMATIVE DEFENSE

FBD's claims are barred in whole or in part because LeanSpa did not act with the requisite level of conduct to be subjected to, or that would otherwise support, any punitive damages award in this action. Accordingly, any award of punitive or exemplary damages against LeanSpa would be improper under the United States Constitution and the common law and public policies of the State of Delaware.

<u>AMENDED COUNTERCLAIMS</u>

PARTIES, JURISDICTION AND VENUE

1.      Counterclaim Plaintiff LeanSpa is a Connecticut limited liability company with its principal place of business located at 420 East Main Street, Building 2, Suite 8, Branford, Connecticut 06405.

2.      Upon information and belief, Counterclaim Defendant FBD is a commercial bank chartered under the laws of the State of Delaware with its principal place of business located at 1000 Rocky Run Parkway, Wilmington, Delaware 19803.

3.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) as the Counterclaim Parties are citizens of different States and the amount in controversy is in excess of the sum or value of $75,000, exclusive of interests and costs.

4.      This Court has personal jurisdiction over the Counterclaim Defendant by virtue of FBD's filing of the Complaint in this action.

5.      Venue is proper pursuant to 28 U.S.C. § 1391(a).

FACTUAL BACKGROUND

6.      From July 2010 to April 2011, LeanSpa marketed a proprietary dietary supplement product to support weight loss.

7.      In or about September 2010, Boris Mizhen ("Mizhen"), on behalf of LeanSpa, sought transaction processing and other services relating to credit and debit transactions.

8.      Upon information and belief, Check21.com, LLC ("Check21") is a registered Independent Sales Organization ("ISO").  Upon information and belief, an ISO acts as a "middle man" between a bank with a credit card processing division and a merchant retailer, with the ISO effectively selling the bank's processing capabilities to merchant retailers.

9.      Check21 and FBD entered into a Merchant ISO Agreement on March 2, 2010, which the parties amended on March 3, 2010 (as amended, the "ISO Agreement").  Pursuant to Article 1.1 of the ISO Agreement, Check21 marketed and promoted transaction processing services performed by FBD and provided customer support with respect to those services.

10.     On or about October 6, 2010, LeanSpa entered into a Merchant Processing Agreement (the "Merchant Agreement") with FBD.  The Merchant Agreement is unclear as to whether Check21 is a party to the Agreement.  The Merchant Agreement states:

> "In consideration of the covenants set forth below, [FBD], which is a member of Visa U.S.A., Inc. ("Visa"), MasterCard International ("MasterCard"), or Discover or jointly with Visa/MasterCard/Discover ("Payment Card Brands") and the undersigned merchant [LeanSpa] have agreed as follows as of the date of acceptance of this Agreement by <<Insert ISO Name>> ("ISO"), as an affiliate of Acquirer for the purpose of providing merchant services."

(Merchant Agreement at 4).

Article 1.2 of the ISO Agreement states:

> "For each approved merchant, FBD, ISO and that merchant will enter into a Merchant Agreement, as required by the Rules (each, a "Merchant Agreement").  The Merchant Agreement will set forth the respective rights and responsibilities of FBD, ISO and the merchant in connection with the Services to be provided to the merchant."

(ISO Agreement at Article 1.2).

11.     According to the ISO Agreement and the Merchant Agreement, Check21 served as FBD's ISO and provided merchant services to LeanSpa.  (ISO Agreement at Article 1.2; Merchant Agreement at 4).  Ido Meros ("Meros"), a Senior Vice President with Check21, served as the main point of contact between LeanSpa and FBD.

12.     Upon information and belief, credit card associations such as Visa and MasterCard have established certain merchant account programs designed to monitor the

chargeback levels of the card acceptors processing their cards.  A chargeback is a reversal of a credit card or check transaction.  Upon information and belief, Visa monitors the monthly chargeback levels and the ratio (expressed as a percentage) of chargeback to total transactions of all commercial entities processing Visa cards and informs the affected processing bank whenever one of the bank's merchants reaches or exceeds a certain level of chargebacks.  Upon information and belief, Visa considers a chargeback ratio of one percent or more of total processed transactions to be excessive.  A merchant is automatically entered into Visa's High Risk Chargeback Monitoring Program when such merchant attains a total chargeback-to-transaction ratio of one percent or higher, and fees of between $100 and $150 per chargeback may be imposed by Visa upon the processing bank while the merchant is in the monitoring program.  Upon information and belief, once a merchant has been in Visa's High Risk Chargeback Monitoring Program for six months, that merchant may be disqualified from the Visa system entirely and it may be impossible for that merchant to obtain future services from payment processing companies.

13.    Section 2.08 of the Merchant Agreement, titled "Chargeback Reserve Account," allowed FBD to establish, and required LeanSpa to fund, a chargeback reserve account (the "Reserve Account").  The Reserve Account could be created for any reason, including breach of the Agreement by LeanSpa, or if LeanSpa incurred chargebacks in excess of a certain level determined by FBD.  Pursuant to Section 2.08 of the Merchant Agreement, FBD could request additional reserve amounts from LeanSpa based upon LeanSpa's processing history and/or anticipated risk of loss to FBD.  Funds remaining in the Reserve Account after all other expenses were paid were to be returned to LeanSpa.  Section 2.08 of the Merchant Agreement states that

"[a]ny balance remaining after chargeback rights have expired and all of [FBD's] other expenses, losses and damages have been paid will be disbursed to [LeanSpa]."

14.     FBD originally requested that LeanSpa fund the Reserve Account with 10% of LeanSpa's monthly sales volume.  LeanSpa repeatedly funded the Reserve Account above and beyond that amount.  For example, in December 2010, LeanSpa voluntarily paid $500,000 into the Reserve Account, even though 10% of LeanSpa's monthly sales volume would have dictated only a deposit of $340,000 into the Reserve Account, an excess of $160,000.

15.     Section 3.07 of the Merchant Agreement, titled "Excessive Chargebacks and/or Retrievals," states that:

> "[LeanSpa] agrees that in the event [FBD] is presented, during any monthly period, with chargebacks and/or retrieval requests relating to the transactions of [LeanSpa] processed by [FBD] in excess of one percent (1%) of interchange volume of such transactions, such chargeback and/or retrieval request will conclusively be deemed to be excessive under applicable Card Issuer Regulations including, but not limited to, terminating this Agreement and/or passing through to [LeanSpa] any charges and/or penalties that may be imposed by Visa/MasterCard/Discover.  In addition to any other remedies provided herein, [FBD] may impose an excessive chargeback fee of Twenty-Five Dollars ($25) per occurrence if [LeanSpa's] monthly chargeback volume exceeds one percent (1%) of monthly sales."

Per this Section 3.07, FBD required LeanSpa to pay any fines or penalties for excessive chargeback ratios imposed upon FBD by the credit card companies.  FBD also earned fees for each chargeback incurred by LeanSpa in any month in which LeanSpa's chargeback ratio exceeded the 1% threshold.  Upon information and belief, the fees assessed by FBD upon LeanSpa were substantial, and constituted a substantial revenue source for FBD.

16.     The Merchant Agreement does not specify how FBD calculated a chargeback ratio.

17.     FBD began processing up to $1 million per month in transaction payments for LeanSpa in mid-October 2010.  As early as November 1, 2010, Meros informed LeanSpa that Check21 calculated only debited chargebacks (and not pending chargebacks) to determine FBD's and Visa's chargeback ratios.  On November 29, 2010, Sian Bastable, Vice President and e-Payments Director at FBD, confirmed in an email to Meros that FBD included only debited chargebacks in its chargeback ratio.  Meros communicated that information to LeanSpa multiple times in November and December 2010.

18.     As early as November 1, 2010, FBD began providing daily reports via email to LeanSpa and Check21.  The daily reports consisted of net automated clearing house transactions for LeanSpa transactions processed by FBD, including chargeback amounts, daily deposits, and Reserve Account adjustments.  Upon information and belief, Christine Ornce, a Vice President of FBD and FBD's e-Payments Operations Manager, and Alissa Chhim, the "AVP, Relationship Manager" at FBD, compiled and submitted the reports to LeanSpa.  The chargeback numbers listed in such reports consisted of only debited chargebacks (and not pending chargebacks).

19.     FBD also provided monthly statements to LeanSpa and Check21 shortly after FBD began processing transaction payments for LeanSpa.  The statements, calculated and confirmed by Sian Bastable, calculated the chargeback ratio for LeanSpa sales processed through FBD.  FBD's statements for the months of October, November, and December stated that LeanSpa had chargeback ratios of 0%, 0.77%, and 0.81%, respectively, well below the 1% threshold.  The reports were mailed to LeanSpa from FBD on Ms. Bastable's direction on or about the seventh day of every month.  LeanSpa could also access an FBD secure site on the thirty-first or first of every month to review the monthly reports, including the monthly chargeback ratios as calculated and confirmed by Ms. Bastable.

20.    In addition to FBD's daily reports and monthly statements, LeanSpa's Chief Operating Officer, James Capuras, monitored LeanSpa's chargeback ratio for sales processed by FBD on a daily basis.  Relying upon FBD's representations and assurances as to the method of chargeback ratio calculations and the daily chargeback numbers submitted to LeanSpa by Christine Ornce of FBD and/or Alissa Chhim of FBD, LeanSpa calculated its chargeback ratio using only the number of debited chargebacks.  FBD was aware that LeanSpa monitored its chargeback ratio, calculated with debited chargebacks, as directed by various FBD employees, including Sian Bastable, Christine Ornce, and Alissa Chhim, in an effort to monitor and maintain a ratio under 1%.

21.    FBD's daily reports and monthly statements and LeanSpa's own calculations (based on FBD's formula) led LeanSpa to believe that it was operating under the 1% chargeback ratio in November and December 2010.  In addition to monitoring its chargeback ratio on a daily basis, LeanSpa voluntarily implemented many different policies or programs in November and December 2010 to ensure that it remained under the 1% chargeback threshold, including, but not limited to, the following: delaying sales transactions for four days after the credit authorization to allow consumers time to cancel their orders before the transaction was processed; declining all orders made with addresses outside the United States; and implementing gateway screening to exclude gift and pre-paid cards.

22.    Upon information and belief, merchant processing banks will not increase a merchant's allowed transaction volume if that merchant's chargeback ratio is in excess of Visa's 1% threshold, or if the merchant has been placed in Visa's High Risk Chargeback Monitoring Program.  Sian Bastable approved increases in LeanSpa's transaction volume even though she

was aware that LeanSpa had been entered into Visa's High Risk Chargeback Monitoring Program.

23.     On or about November 17, 2010, Sian Bastable approved an increase in LeanSpa's transaction volume to $1.75 million in transaction payments per month.  One month later, on December 17, 2010, Ms. Bastable again approved an increase in LeanSpa's transaction volume to $5 million in transaction payments per month.

24.     By increasing LeanSpa's transaction volume in November and December, FBD indicated to LeanSpa that (a) LeanSpa's transaction processing was problem-free, (b) that LeanSpa was not in Visa's High Risk Chargeback Monitoring Program, and (c) that LeanSpa was operating under a 1% chargeback ratio for the months of November and December. Unfortunately for LeanSpa, while multiple employees at FBD were openly indicating that LeanSpa's transaction processing was problem-free in November and December, FBD simultaneously was concealing from LeanSpa that LeanSpa was in Visa's High Risk Chargeback Monitoring Program.

25.     FBD was incentivized to increase LeanSpa's transaction processing volume because, per the Merchant Agreement, FBD received a fee for each and every transaction processed by LeanSpa through FBD.  (See Merchant Agreement at § 3.07).  In addition, FBD collected a large fee from LeanSpa for each chargeback incurred by LeanSpa in any months in which LeanSpa exceeded the 1% chargeback threshold.  (See Merchant Agreement at § 3.07).  In other words, increasing LeanSpa's processing volume meant increased revenues for FBD because FBD earned fees for each processed transaction.  Any corresponding escalation in chargebacks as a result of the increased volume of transactions processed for LeanSpa through FBD also resulted in increased revenues for FBD through FBD's imposition of fees and fines

upon LeanSpa for each chargeback incurred by LeanSpa in any months in which LeanSpa exceeded the 1% chargeback threshold.

26.     LeanSpa relied upon FBD's incorrect instructions, in the form of communications from Sian Bastable, daily reports from Christine Ornce and/or Alissa Chhim, and monthly statements calculated and confirmed by Ms. Bastable, to calculate its chargeback ratio with debited chargebacks only.  Using debited chargeback numbers, LeanSpa's chargeback ratios were below 1%.  Additionally, FBD's chargeback ratios contained within the monthly statements submitted to LeanSpa calculated LeanSpa's chargeback ratios for October, November, and December at 0%, 0.77%, and 0.81%, respectively.  As such, LeanSpa had no reason to believe that its chargebacks had exceeded the 1% chargeback ratio threshold for November and December 2010.  Moreover, on December 17, 2010, Check21 confirmed to LeanSpa that LeanSpa's chargebacks did not exceed the 1% chargeback ratio when the ratio was calculated using debited chargeback numbers.

27.     The months of November and December 2010 were critical to LeanSpa's success.  LeanSpa evaluated current sales numbers, projections based on those numbers, and, most importantly, chargeback calculations in an effort to determine if the LeanSpa brand could be a viable product in the weight loss supplement industry.  Relying upon (i) FBD's chargeback ratios contained in the monthly statements, (ii) the debited chargeback numbers (and not pending chargeback numbers) displayed in the daily reports, (iii) Sian Bastable's approval to increase LeanSpa's monthly processing volume, and (iv) LeanSpa's own daily chargeback calculations using FBD's chargeback calculation formula, LeanSpa believed that it was operating well below the 1% chargeback threshold in October, November, and December 2010.  Furthermore, based upon misrepresentations made by Sian Bastable, Christine Ornce, and Alissa Chhim to LeanSpa

that its chargeback levels remained well under 1% in October, November, and December, LeanSpa believed that it had a viable product and sales methodology.

28.     Through a series of material misrepresentations and omissions made by Sian Bastable, Christine Ornce, Alissa Chhim, and Kathryn Franklin, Vice President of FBD's e-Payments division, FBD caused LeanSpa to incur millions of dollars in chargeback fines.  Upon information and belief, in a letter sent to FBD's Alissa Chhim in November 2010, Visa alerted FBD that LeanSpa was close to or exceeding a 1% chargeback ratio for the month.  At that point in time, FBD was aware, or should have been aware, that Visa calculated its chargeback ratio using pending rather than debited chargeback numbers.  Ms. Chhim -- as well as all other FBD personnel -- failed to alert LeanSpa of this critical error by FBD, and FBD even confirmed to LeanSpa on December 31, 2010, well after Visa's November communication and well after Ms. Chhim's receipt of a December 8, 2010 letter from Visa regarding LeanSpa's excessive chargeback ratio, that LeanSpa could continue to calculate its chargeback ratio using only debited chargeback numbers.  Upon further information and belief, in response to Visa's November communication to FBD that LeanSpa was at or nearing the 1% chargeback threshold, FBD submitted a form requested by Visa detailing the efforts taken by LeanSpa to reduce chargeback numbers.  Neither Ms. Chhim nor Sian Bastable, nor any other FBD employee, timely alerted Check21 or LeanSpa of Visa's November communication to FBD regarding LeanSpa's chargeback ratio, nor did FBD inform Check21 or LeanSpa of FBD's subsequent response to Visa regarding LeanSpa's chargeback reduction efforts.

29.     Upon information and belief, Visa communicates news of a merchant exceeding its 1% chargeback threshold solely to the processing or merchant banks, with the expectation that the processing bank would address any chargeback-related issues with the merchant.  As such,

LeanSpa had no direct contact with Visa, because all communications occurred between Visa and FBD. Upon information and belief, Alissa Chhim, Sian Bastable, Kathryn Franklin, and other FBD employees intentionally failed to alert LeanSpa that FBD's chargeback calculations were incorrect, and concealed from LeanSpa for months that LeanSpa was exceeding Visa's chargeback ratio threshold. Upon information and belief, FBD's failure to alert LeanSpa that FBD's chargeback calculations were incorrect was intentional because FBD earned substantial revenues from LeanSpa's transaction processing, both on the "front end" (through per-transaction fees), and on the "back end" (through fees and fines levied against LeanSpa by FBD as a result of excessive chargebacks).

30.     Per Section 3.07 of the Merchant Agreement, all chargeback fees Visa imposed upon FBD as a result of LeanSpa's chargebacks would be passed on to LeanSpa. In addition, a fee of $25 per chargeback would be levied upon LeanSpa by FBD in any months in which LeanSpa's chargebacks exceeded the 1%. LeanSpa's chargebacks were not a concern to FBD, because any fines or fees levied by Visa against FBD simply would be passed on to LeanSpa pursuant to the terms of the Merchant Agreement. In addition, FBD held millions of dollars of LeanSpa's funds in the Reserve Account that covered any fines that could be imposed by Visa upon FBD as a result of chargebacks incurred by LeanSpa. In other words, FBD faced no potential financial exposure due to chargeback fees imposed by Visa, and FBD could impose an additional $25 fee upon LeanSpa for each chargeback incurred by LeanSpa in any month in which LeanSpa's chargebacks exceeded the 1% threshold. Such $25 fee constituted a substantial revenue source for FBD. Upon information and belief, imposition of this $25 fee, as of April 2011, resulted in revenue for FBD in excess of $330,000.

31.    In a letter addressed to Alissa Chhim, dated December 8, 2010, Visa alerted FBD that LeanSpa "continued to exceed the High Risk Chargeback Monitoring Program" threshold of 1% for the month of November and that FBD would be assessed fees of $100 per chargeback.  On January 11, 2011, FBD received another letter from Visa, also addressed to Ms. Chhim, in which Visa stated that LeanSpa had continued to exceed Visa's High Risk Chargeback Monitoring Program threshold for the month of December.  Visa's January 11 letter cautioned that the fees assessed as a result of exceeding the monitoring program's threshold could increase to $150 per chargeback if LeanSpa remained in the monitoring program for another month. Upon information and belief, Ms. Chhim forwarded the December and January letters from Visa to several FBD employees, including Sian Bastable, Kathryn Franklin, and Christopher Nace, Vice President of FBD.  None of these employees informed LeanSpa or Check21 of FBD's receipt of the December or January letters, or of LeanSpa's inclusion in Visa's High Risk Chargeback Monitoring Program, until January 14, 2011 at the earliest.

32.    On January 14, 2011, in an email copying two other FBD employees (Christopher Nace and Kathryn Franklin), Sian Bastable informed Check21 that FBD was terminating LeanSpa's account because LeanSpa was entering its third month in Visa's High Risk Chargeback Monitoring Program.  On the same day, FBD ceased releasing funds to LeanSpa.  This was the first time that FBD informed LeanSpa that LeanSpa had exceeded Visa's chargeback threshold of 1%, and that it had been placed into Visa's High Risk Chargeback Monitoring Program.

33.    In addition to incurring millions of dollars in fines from Visa and FBD as a result of intentional misrepresentations and omissions by Kathryn Franklin, Sian Bastable, Alissa Chhim, Christine Ornce, and Christopher Nace, FBD's failure to alert LeanSpa in a timely

manner of its inclusion in Visa's High Risk Chargeback Monitoring Program cost LeanSpa millions of dollars in expected and prospective profits.  On or about January 18, 2011, several payment processing centers declined to enter into merchant processing agreements with LeanSpa as a result of LeanSpa's inclusion in Visa's High Risk Chargeback Monitoring Program, resulting in substantial lost profits for LeanSpa.  Additionally, on or about January 19, 2011, certain payment processing centers that had existing merchant processing agreements with LeanSpa terminated their accounts with LeanSpa as a result of LeanSpa's inclusion in Visa's High Risk Chargeback Monitoring Program.  These cancellations also resulted in substantial lost profits for LeanSpa.

34.    Check21 acknowledged FBD's inept behavior in an email to the then-Vice President of FBD, Alonzo Primus, on January 19, 2011.  Meros noted that "we (FBOD & C21) have asked of Leanspa to change many items in the process ranging from customer service, to processing, to shipping" and Mizhen, acting on behalf of LeanSpa, "has done everything [FBD and Check21] requested including adding $180,000.00 in upfront reserve above the 10% originally requested by FBOD."  Meros acknowledged that "[a]bove and beyond, we have been feeding Leanspa wrong information regarding chargebacks.  We have told [LeanSpa] on multiple occasions that the Visa numbers are based on debited chargeback counts only to find out that the numbers Visa used to place [LeanSpa] in the program was the pending count.  If we didn't feed wrong information to them, we could have upped the volume a bit to lower the overall ratio and not cost [LeanSpa] the $100 chargeback or the higher cost of being in the program itself."  Meros further noted that "[e]ven with the assessment fees, the bank has an excess of reserve capital due to the upfront reserve.  Above and beyond, to help [LeanSpa] in acquiring another institution to work with, [LeanSpa] has asked for a letter from the bank stating that [it] was informed that the

numbers used by Visa would be debited and not pending chargebacks which led to [its] exit. Without this letter, other institutions would believe that the account is problematic when in essence [LeanSpa] is probably the most legitimate continuity merchant I know." Meros urged FBD to "help me make this right as really the blame falls on us. [LeanSpa] has done everything right only to be provided bad information leading to an instability in [its] account." On January 20, 2011, FBD reinstated LeanSpa's account and agreed to allow LeanSpa to process its transactions with FBD through January 31, 2011.

35.     On or around January 27, 2011, Mizhen and Meros traveled to FBD's office in Philadelphia, Pennsylvania to meet with Kathryn Franklin to seek payment processing services from FBD for LeanSpa beyond the end of the month. On or around that date, FBD decided to continue its relationship with LeanSpa and Check21 without a set termination date. In an effort to work with FBD to reduce its chargeback ratio, the parties agreed to maintain open lines of communication -- something that LeanSpa told Ms. Franklin had been lacking on FBD's part previously -- by scheduling weekly conference calls with representatives from LeanSpa, Check21, and FBD (including Ms. Franklin) beginning on February 4, 2011. Ms. Franklin frequently cancelled the conference calls. During each conference call that did occur, LeanSpa inquired about Visa's concern with LeanSpa and FBD in general. Ms. Franklin's consistent response was that there was no overriding concern. If FBD had alerted LeanSpa of any concerns or issues Visa had regarding LeanSpa, LeanSpa would have ceased processing new sales as soon as practicable.

36.     In addition to the voluntary efforts LeanSpa implemented previously, LeanSpa implemented additional chargeback reduction efforts after receiving FBD's January 14 termination notice, including the following: taking its customer service center in-house and

increasing customer service availability to seven days per week from 9:00am to 9:00pm EST; allowing credits to be processed without any documented return verification from customers; verifying consumer addresses with the United States Postal Service and other shipping providers; auto-crediting rejected shipments; and analyzing chargeback numbers to best identify and attack the underlying reasons for the returns.

37.     On March 2, 2011, five days before a scheduled withdrawal of funds, FBD automatically debited $450,000 from LeanSpa's account for "bank fees."  Moreover, one month later, FBD withheld $3 million in proceeds from processed transactions from LeanSpa.  Such early withdrawal of funds, and wrongful withholding of funds, made it difficult for LeanSpa to pay certain of its vendors, including Leadclick Media, Inc. ("Leadclick").

38.     On or about March 10, 2011, Check21 notified LeanSpa that FBD had received another letter from Visa, addressed to Alissa Chhim, dated March 9, 2011, stating that LeanSpa had exceeded the 1% chargeback ratio for the month of February.  Among other things, Visa's letter requested an analysis of the effectiveness of FBD's and LeanSpa's efforts to reduce the chargeback ratio.  On or about March 18, 2011, LeanSpa submitted a draft letter to FBD containing an analysis of LeanSpa's efforts to reduce the chargeback ratio.  Upon information and belief, this draft letter to FBD was to be incorporated into a combined response to Visa's March 9 letter.  In the email attaching such documentation, Meros noted that "[w]hat was not included in the letter was the delayed notification to Leanspa of its inclusion in the Visa program in November and December and the confusion surrounding the measurement of chargebacks (pending vs debited).  Both of these issues impacted Leanspa's abilities to remain out of the program."

39.     Upon information and belief, FBD submitted a letter to Visa responding to Visa's request for an analysis of the efforts to reduce LeanSpa's chargeback ratio.  Upon information and belief, the letter failed to mention the fact that FBD failed to alert LeanSpa for months of LeanSpa's inclusion in Visa's High Risk Chargeback Monitoring Program, and, not surprisingly, failed to admit to Visa that FBD had provided incorrect chargeback information to LeanSpa since the inception of the relationship between FBD and LeanSpa.  FBD never gave to LeanSpa a final copy of the letter submitted to Visa.

40.     On or about April 6, 2011, Mizhen and Meros again traveled to FBD's office in Philadelphia, Pennsylvania to meet with Kathryn Franklin and the head of FBD's Risk Department.  At the meeting, Ms. Franklin sought confirmation from LeanSpa that it would continue to process new sales through FBD.  Due to its concerns about the chargeback ratio, the resulting fines, and the risks from being in Visa's High Risk Chargeback Monitoring Program for an extended period of time, however, LeanSpa told Ms. Franklin that it wanted to work on an exit strategy to wind down sales of LeanSpa's product.  Ultimately, the parties agreed that LeanSpa would voluntarily terminate the account with FBD on April 21, 2011 so that no new sales would be processed beyond that date.  FBD also agreed to submit a letter to Visa stating that LeanSpa had voluntarily terminated the account.  To ensure that FBD was properly protected, LeanSpa agreed to add additional funds to the Reserve Account.  Ms. Franklin informed LeanSpa five days before the April 6 meeting that the total remaining reserves, as of April 21, were projected to be $4,199,259.35.

41.     On April 26, 2011, Check21 received a spreadsheet from Kathryn Franklin, dated April 5, 2011, calculating the total remaining funds in the Reserve Account to be approximately $4,333,174.00 as of April 22, 2011.  Check21 forwarded the spreadsheet to LeanSpa on the same

day.   Check21 received the same spreadsheet from Ms. Franklin, with the same projected numbers, on May 27, 2011, more than one month after FBD ceased processing transaction payments for LeanSpa.  Ms. Franklin's email to Check21 indicated that it was the "most recent accounting for LeanSpa's reserve account."  Check21 forwarded the spreadsheet to LeanSpa on the same day.

42.     Unexpectedly, and in violation of the agreement reached between LeanSpa and FBD during the April 6, 2011 meeting, FBD terminated the account with LeanSpa prematurely on April 19, 2011.  Further, FBD's Kathryn Franklin submitted a letter to Visa stating that FBD had terminated the account as of that date, although LeanSpa had communicated to FBD and Kathryn Franklin during the April 6, 2011 meeting that LeanSpa agreed to voluntarily terminate the account.

43.     Although LeanSpa was unable to process any further payments through FBD as of April 19, it continued to process refunds and chargebacks through FBD in the month of May.

44.     Upon information and belief, Visa will forego assessing chargeback fines if a merchant voluntarily terminates an account.  Upon further information and belief, Visa will assess chargeback fines if a bank terminates a merchant account.  FBD intentionally caused LeanSpa to incur over $2 million in additional chargeback fines as a result of the letter FBD submitted to Visa because FBD incorrectly informed Visa that FBD had terminated LeanSpa's account, rather than that LeanSpa had voluntarily terminated the account.  FBD was incentivized to convey to Visa that FBD had terminated the account, rather than explaining that LeanSpa voluntarily terminated the account, so that FBD could "save face" with Visa, and because FBD received a $25 fee for each and every chargeback LeanSpa incurred.  Moreover, any additional

chargeback fees imposed by Visa upon FBD were of no concern to FBD because such additional chargeback fees simply were passed along to LeanSpa pursuant to the Merchant Agreement.

45.     From the beginning of the parties' relationship, FBD mismanaged LeanSpa's account and failed to provide accurate and timely information to LeanSpa.  In May 2011, Visa appeared to acknowledge FBD's deficiency in yet another letter addressed to Alissa Chhim, dated May 7, 2011, in which Visa alerted FBD that LeanSpa had continued to exceed Visa's High Risk Chargeback Monitoring Program threshold.  Visa stated that it had provided FBD with "sufficient opportunity to take the actions necessary to reduce the chargebacks below the HRCMP thresholds."

46.     FBD's inept behavior did not end with the termination of LeanSpa's account.  On May 19, 2011, Meros alerted LeanSpa that FBD was in the process of terminating the totality of FBD's merchant processing operations.  LeanSpa's main contact at FBD, Kathryn Franklin, confirmed the news on May 24, 2011 that FBD was exiting the merchant processing business.  In addition to terminating its merchant processing operations, on May 24, 2011, FBD terminated most of its merchant processing-related workforce and deactivated LeanSpa's account, thereby eliminating LeanSpa's ability to issue refunds to customers.  FBD refused to pay certain residual payments that FBD was obligated to make to many of its merchants in late June, another indication that FBD was ill-equipped to deal with merchants, and ill-equipped to be involved in the merchant processing business.

47.     Even after terminating and deactivating LeanSpa's account, FBD continued to provide incorrect information to LeanSpa.  On May 23, 2011, Kathryn Franklin informed Check21 that she believed that Visa was going to waive any assessments for FBD and LeanSpa for the month of April.  Two days later, on May 25, 2011, Ms. Franklin notified LeanSpa that not

only was Visa going to fine LeanSpa for excessive chargebacks completed in April, but Visa was going to fine LeanSpa for 180 days of trailing activity despite the fact that FBD had terminated the account in April.  Ms. Franklin noted in her email that the total fines assessed from April through September 2011, including fines assessed by MasterCard, totaled $2,662,665.  LeanSpa and Check21 requested a copy of Visa's assessment letter, a reconciliation report for the Reserve Account, and FBD's assistance in appealing Visa's decision prior to submitting additional reserve funds to FBD.  Ms. Franklin refused to provide a copy of the assessment letter, documentation regarding the Reserve Account, or assistance with an appeal, demanding instead that LeanSpa provide $1 million immediately to cover the supposedly impending fines.

48.     On April 21, 2011, Ms. Franklin estimated that the funds in the Reserve Account, totaled $4,199,259.35.  Moreover, on April 26, 2011, Check21 received a spreadsheet from Ms. Franklin, dated April 5, 2011, stating that the total remaining funds in the Reserve Account were projected to be $4,333,174.00 as of April 22, 2011, more than enough to cover the $2.6 million in purported fines assessed by Visa and MasterCard from April through September 2011, as well as the $1 million demanded by Ms. Franklin at the end of May.  Check21 forwarded the spreadsheet to LeanSpa on the same day.

49.     Check21 received the same spreadsheet from Kathryn Franklin, with the same projected numbers, on May 27, 2011, more than one month after FBD ceased processing transaction payments for LeanSpa.  Ms. Franklin's email to Check21 indicated that it was the "most recent accounting for LeanSpa's reserve account."  Check21 forwarded the spreadsheet to LeanSpa on the same day.  FBD has not responded to LeanSpa's repeated requests regarding the total amount of funds in the Reserve Account since May 27, 2011.

50.     Upon information and belief, several FBD employees, including Alissa Chhim, Kathryn Franklin, and Sian Bastable, intentionally failed to alert LeanSpa in a timely manner of letters FBD received from Visa relating to LeanSpa's chargeback ratio.   Because these FBD employees withheld letters from Visa alerting FBD of LeanSpa's excessive chargebacks, LeanSpa incurred unnecessary fines imposed by both Visa and FBD.   Moreover, FBD's failure (or unwillingness) to communicate with Visa exponentially increased the fines that Visa imposed on LeanSpa.   For example, LeanSpa requested that FBD admit to Visa that FBD delayed notification to LeanSpa regarding LeanSpa's inclusion in Visa's High Risk Chargeback Monitoring Program.   FBD refused.   Upon information and belief, such actions led Visa to impose fines upon LeanSpa for 180 days of trailing activity past the termination of LeanSpa's account by FBD on April 19, 2011.

51.     Based upon Sian Bastable's, Alissa Chhim's, and Christine Ornce's representations to LeanSpa that LeanSpa's chargeback levels remained well below 1% in October, November, and December, LeanSpa believed that it had a viable product.   Relying upon such representations, LeanSpa believed that it needed to increase production ahead of anticipated increases in product demand, and, as a result, LeanSpa ordered significant amounts of supplies from its vendors.   In addition, in reliance on the anticipated increase in demand for LeanSpa's product based upon FBD's representations, LeanSpa also contracted with various entities to provide increased advertising for its product.

52.     Based upon Sian Bastable's, Alissa Chhim's, and Christine Ornce's representations to LeanSpa, LeanSpa engaged in high volumes of sales activity in November and December.   This increase in sales activity unfortunately was coupled with an increase in the level of chargebacks that LeanSpa could not have possibly anticipated, given the level of FBD's

misrepresentations and omissions.  Had FBD alerted LeanSpa immediately of FBD's critical calculating error and/or LeanSpa's inclusion in Visa's High Risk Chargeback Monitoring Program, LeanSpa never would have increased production or advertising for its product.  To the contrary, LeanSpa likely would have evaluated whether to continue operations at all.

53.     As a result of Sian Bastable's, Kathryn Franklin's, Alissa Chhim's, and Christine Ornce's misrepresentations and omissions, and LeanSpa's efforts taken in reliance on FBD's misrepresentations and omissions, LeanSpa currently is in possession of approximately $5 million worth of its product that it cannot sell.

54.     Upon information and belief, FBD failed to maintain adequate records regarding the Reserve Account and the level of funds contained therein.  For example, in response to LeanSpa's query as to the total reserves held in the Reserve Account, Meros stated on March 6, 2011 "[t]o be honest, I don't think [FBD] know[s] how much they have."  On March 29, 2011, Check21 requested an accounting from FBD as to the total reserves held in the Reserve Account. In Check21's email, Check21 estimated that FBD had roughly $5.2 million in the Reserve Account.  In FBD's response to Check21 and to LeanSpa on April 1, 2011, however, Kathryn Franklin indicated that the funds in the Reserve Account were projected to be $4,199,259.35 as of April 21, 2011.  Moreover, on April 26, 2011, Check21 received an email from Ms. Franklin, attaching a spreadsheet, dated April 5, 2011, stating that the total remaining funds in the Reserve Account were projected to be $4,333,174.00 as of April 22, 2011.  Check21 promptly forwarded the spreadsheet to LeanSpa on the same day.  Check21 received the same spreadsheet from Ms. Franklin, with the same projected numbers, on May 27, 2011, more than one month after FBD ceased processing transaction payments for LeanSpa.  Ms. Franklin's email to Check21 indicated that it was the "most recent accounting for LeanSpa's reserve account."  Check21 forwarded the

spreadsheet to LeanSpa on the same day.  FBD has not responded to LeanSpa's repeated requests regarding the total amount of funds in the Reserve Account since submitting April Reserve Account totals to Check21 on May 27, 2011.

55.    In the spring of 2011, LeanSpa frequently requested an accounting from FBD as to the amount of funds in the Reserve Account.  Despite LeanSpa's repeated requests for information regarding the total amount of funds in the Reserve Account, the most recent information that has been provided to LeanSpa are projections that were calculated in early April 2011. FBD repeatedly has failed to provide updated information to LeanSpa, even after LeanSpa's counsel sought such information from the Chairman of FBD's Board of Directors on June 16, 2011.  Upon information and belief, funds remain in the Reserve Account, but FBD wrongfully has refused to remit such funds to LeanSpa.

## COUNTERCLAIM I
## FRAUDULENT MISREPRESENTATION

56.    LeanSpa hereby adopts and incorporates by reference the allegations set forth in paragraphs 1 to 55 of its Counterclaim as if fully set forth herein.

57.    FBD was required to report to LeanSpa accurately the level of chargebacks LeanSpa received on a  monthly basis.

58.    Visa informed FBD, in letters addressed to Alissa Chhim, that LeanSpa's chargebacks exceeded the 1% threshold during the months of November and December, 2010.

59.    Despite knowing that LeanSpa's chargebacks were above Visa's 1% threshold for November and December, 2010, FBD incorrectly informed LeanSpa, through monthly reports calculated and confirmed by Sian Bastable, that LeanSpa's monthly chargeback ratios were 0.77% and 0.81% for November and December, 2010, respectively.  Additionally, FBD continued to provide inaccurate information regarding chargeback levels after December 2010.

60.     Despite knowing that LeanSpa's chargebacks were above Visa's 1% threshold in the months of November and December, 2010, Alissa Chhim and Christine Ornce continued to submit daily reports to LeanSpa that misrepresented true chargeback levels.   Moreover, Sian Bastable confirmed to LeanSpa in late November 2010, after FBD already had received a communication from Visa that LeanSpa had exceeded Visa's 1% chargeback ratio, that FBD included only debited chargebacks in its chargeback ratio.   FBD knew that LeanSpa relied on FBD's incorrect data to calculate its chargeback ratio.

61.     FBD's misrepresentation to LeanSpa of the actual chargeback ratio and the types of chargebacks used by Visa in calculating its 1% threshold was intended to induce LeanSpa to continue to increase sales activity, and was intended to conceal from LeanSpa any concerns relating to chargebacks.   Such concealment was intended to generate increasing front-end profits for FBD (through per-transaction fees), as well as increasing back-end profits for FBD (through fees imposed on a per-chargeback basis upon LeanSpa by FBD) through LeanSpa's increased sales activity.

62.     Based upon LeanSpa's justifiable reliance on FBD's misrepresentations regarding chargebacks, including misrepresentations made by Sian Bastable, Kathryn Franklin, Christine Ornce, and Alissa Chhim, LeanSpa concluded that the business plan for LeanSpa was viable.   That conclusion by LeanSpa, which flowed from LeanSpa's reliance on FBD's misrepresentations, caused LeanSpa to ramp-up production of product, advertising and sales.

63.     LeanSpa's increased production of product based upon FBD's misrepresentations as to chargeback levels caused LeanSpa to produce $5 million of product that LeanSpa now cannot sell.

64.     LeanSpa's increased use of advertising based upon FBD's misrepresentations as to chargeback levels caused LeanSpa to incur advertising costs in excess of $10 million.

65.     LeanSpa's increased sales based upon FBD's misrepresentations as to chargeback levels caused LeanSpa to incur additional chargebacks that would not have been incurred but for FBD's misrepresentations to LeanSpa.   The fees associated with such chargebacks total in the millions of dollars.

66.     FBD's misrepresentations have damaged LeanSpa in an amount to be proven at trial.

67.     FBD acted in an egregious, malicious, willful and wanton manner, and in bad faith.  As a result, LeanSpa is entitled to punitive damages.

COUNTERCLAIM II
NEGLIGENT MISREPRESENTATION

68.     LeanSpa hereby adopts and incorporates by reference the allegations set forth in paragraphs 1 to 67 of its Counterclaim as if fully set forth herein.

69.     FBD had a duty to inform LeanSpa accurately and truthfully of the level of chargebacks incurred by LeanSpa on a monthly basis.

70.     FBD employees, including Sian Bastable, Kathryn Franklin, Christine Ornce, and Alissa Chhim, provided to LeanSpa false information relating to the level of chargebacks incurred by LeanSpa during November and December, 2010, and beyond.

71.     Those same FBD employees failed to exercise reasonable care in communicating the true level of chargebacks to LeanSpa, as Visa had reported the true level of chargebacks to them prior to their inaccurate reporting of chargeback levels to LeanSpa.

72.     LeanSpa justifiably relied upon communications from Sian Bastable, Kathryn Franklin, Christine Ornce, and Alissa Chhim regarding chargeback levels and Visa's calculation

of its 1% chargeback threshold, as LeanSpa could not communicate directly with Visa, and LeanSpa had no reason to suspect that FBD would report inaccurately Visa's method of calculating chargeback ratios.

73.     Based upon LeanSpa's justifiable reliance on the false information provided by FBD, LeanSpa concluded that the business plan for LeanSpa was viable.  That conclusion by LeanSpa, which flowed from LeanSpa's reliance on FBD's false information, caused LeanSpa to ramp-up production of product, advertising and sales.

74.     LeanSpa's increased production of product based upon false information provided by FBD caused LeanSpa to produce $5 million of product that LeanSpa now cannot sell.

75.     LeanSpa's increased employment of advertising based upon false information provided by FBD caused LeanSpa to incur advertising costs in excess of $10 million.

76.     LeanSpa's increased sales based upon false information provided by FBD caused LeanSpa to incur additional chargebacks that would not have been incurred but for FBD's misrepresentations to LeanSpa.

77.     FBD's misrepresentations have damaged LeanSpa in an amount to be proven at trial.

78.     FBD acted in an egregious, malicious, willful and wanton manner, and in bad faith.  As a result, LeanSpa is entitled to punitive damages.

COUNTERCLAIM III
TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

79.     LeanSpa hereby adopts and incorporates by reference the allegations set forth in paragraphs 1 to 78 of its Counterclaim as if fully set forth herein.

80.     During the relevant time period, LeanSpa had contracts with various vendors and suppliers.   These contracts included a contract between LeanSpa and Leadclick (through Leadclick's eAdvertising Premium Network division).

81.     FBD knew that LeanSpa had entered into contracts with various vendors and suppliers.   FBD knew specifically that LeanSpa had entered into a contract for advertising services with Leadclick.

82.     FBD purposefully and intentionally:

(a)     withdrew $450,000 prematurely from LeanSpa's account in violation of the relevant agreements between LeanSpa and FBD, thereby causing LeanSpa to suffer a cash shortfall;

(b)     withheld $3 million wrongfully from LeanSpa in violation of the relevant agreements between LeanSpa and FBD, thereby causing LeanSpa to suffer a cash shortfall;

(c)     terminated wrongfully LeanSpa's merchant processing capabilities, thereby ensuring that LeanSpa could not generate revenues on a going-forward basis;

(d)     failed to inform LeanSpa that LeanSpa had exceeded the 1% chargeback threshold, thereby causing other payment processing vendors to refrain from initiating a relationship with LeanSpa, and thus ensuring that LeanSpa could not generate revenues on a going forward basis.

83.     Leadclick initiated litigation in the United States District Court for the District of California (the "California Court"), in an action captioned Leadclick Media, Inc. v. LeanSpa,

LLC, et al., C.A. No. 11-4423.  In that action, Leadclick asserts, among other things, that LeanSpa breached certain agreements that had been entered into by LeanSpa and Leadclick.

84.     To the extent that the California Court determines that LeanSpa breached a contract between LeanSpa and Leadclick, such breach was caused by FBD.  FBD's premature withdrawal of $450,000 and the wrongful withholding of $3 million belonging to LeanSpa, wrongful termination of LeanSpa's processing capabilities, and failure to inform accurately LeanSpa of chargeback levels were significant factors in causing any breach of contract that may be found by the California Court.

85.     FBD's premature withdrawals of $450,000 and the wrongful withholding of $3 million belonging to LeanSpa, wrongful termination of LeanSpa's processing capabilities, and failure to inform accurately LeanSpa of chargeback levels were intentional acts by FBD, and such acts were without justification.

86.     As a result of FBD's interference with LeanSpa's contractual relations, FBD has proximately caused LeanSpa to suffer substantial damages.

COUNTERCLAIM IV
UNJUST ENRICHMENT

87.     LeanSpa hereby adopts and incorporates by reference the allegations set forth in paragraphs 1 to 86 of its Counterclaim as if fully set forth herein.

88.     Upon information and belief, funds belonging to LeanSpa remain in the Reserve Account.

89.     By wrongfully retaining the excess funds in the Reserve Account, FBD has been unjustly enriched.

90.     As a direct result of FBD's retention of LeanSpa's funds, LeanSpa has been impoverished in an amount to be proven at trial.

37

91.     Without justification, FBD has refused to return to LeanSpa the remaining excess funds held by FBD in the Reserve Account.

92.     FBD acted in an egregious, malicious, willful and wanton manner, and in bad faith by intentionally retaining LeanSpa's funds.  Accordingly, LeanSpa is entitled to punitive damages.

## COUNTERCLAIM V
## BREACH OF CONTRACT

93.     LeanSpa hereby adopts and incorporates by reference the allegations set forth in paragraphs 1 to 92 of its Counterclaim as if fully set forth herein.

94.     The Merchant Agreement is an enforceable contract between FBD and LeanSpa.

95.     Section 2.08 of the Merchant Agreement mandates that excess funds in the Reserve Account be returned to LeanSpa.

96.     LeanSpa has performed each and every one of its obligations under the Merchant Agreement.

97.     FBD materially breached the Merchant Agreement by refusing to return excess funds in the Reserve Account to LeanSpa.

98.     Additionally, FBD materially breached the Merchant Agreement by (a) failing to report to LeanSpa accurately the level of chargebacks LeanSpa received on a monthly basis; (b) failing to inform LeanSpa in a timely fashion of fees and fines assessed by Visa and/or MasterCard against LeanSpa; (c) failing to inform LeanSpa in a timely fashion that LeanSpa had exceeded the 1% chargeback threshold and that it had been placed in Visa's High Risk Chargeback Monitoring Program; (d) prematurely withdrawing $450,000 from LeanSpa's account; and (e) wrongfully withholding $3 million from LeanSpa.

99.     As a direct and proximate result of FBD's material breaches of the Merchant Agreement, LeanSpa has suffered and will continue to suffer injury in an amount to be determined at trial.

COUNTERCLAIM VI<br>BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

100.     LeanSpa hereby adopts and incorporates by reference the allegations set forth in paragraphs 1 to 99 of its Counterclaim as if fully set forth herein.

101.     Under the Merchant Agreement, FBD had an implied contractual obligation to report accurately LeanSpa's chargeback levels to LeanSpa.

102.     In addition, under the Merchant Agreement, FBD had an implied contractual obligation to inform LeanSpa if and when any credit card association -- including Visa and MasterCard -- imposed fees or fines upon LeanSpa as a result of chargeback levels, and if and when any credit card association placed LeanSpa in any program such as Visa's High Risk Chargeback Monitoring Program because placement in such a program could result in increased fees assessed against LeanSpa.

103.     FBD breached its implied contractual obligations by (a) failing to accurately inform LeanSpa of LeanSpa's chargebacks, (b) failing to inform LeanSpa of fees and fines assessed by Visa and/or MasterCard against LeanSpa, and (c) failing to inform LeanSpa in a timely fashion that LeanSpa had been placed in Visa's High Risk Chargeback Monitoring Program.  Such failures by FBD resulted in LeanSpa incurring unnecessary fees and/or fines, resulted in LeanSpa being unable to secure the services of other merchant payment processors, and resulted in LeanSpa losing substantial business and potential profits.

104.     As a result of FBD's breaches of the implied covenant of good faith and fair dealing, FBD has proximately caused LeanSpa to suffer damages.

WHEREFORE, LeanSpa respectfully requests that this Court:

1.      Order an accounting of all funds located in the Reserve Account;

2.      Order the imposition of a constructive trust wherein the excess funds in the Reserve Account shall be held pending the outcome of this action;

3.      Award damages in LeanSpa's favor and against FBD in an amount to be proven at trial;

4.      Award to LeanSpa its costs and reasonable attorneys' fees occurred in connection with this action;

5.      Award to LeanSpa pre and post judgment interest; and

6.      Award to LeanSpa any such other and further relief as this Court deems just, reasonable and proper.

GREENBERG TRAURIG, LLP


_/s/ Gregory E. Stuhlman_
Michael J. Maimone (#3592)
Joseph B. Cicero (#4388)
Gregory E. Stuhlman (#4765)
Eve H. Ormerod (#5369)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
(302) 661-7000

Attorneys for Defendant/Counterclaim Plaintiff
LeanSpa, LLC

Dated:  November 14, 2011

_DEL 86,382,895v11 11-14-11_